

**FILED**

May 28 2015, 7:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Anne Murray Burgess
Joanna Green
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| John R. Myers II, <br><br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br><br> *Appellee-Respondent* | May 28, 2015 <br><br> Court of Appeals Cause No. 55A05-1312-PC-608 <br><br> Appeal from the Morgan Superior Court <br><br> The Honorable G. Thomas Gray, Judge <br><br> Cause No. 55D01-0902-PC-33 |

**Friedlander, Judge.**

[1] John R. Myers II appeals from the denial of his petition for post-conviction relief (PCR). He raises the following restated issues on appeal:

> 1. Did the post-conviction court err in concluding that Myers was not denied the effective assistance of trial counsel?

2. Did the post-conviction court err in concluding that Myers's due process rights were not violated by the State's alleged failure to disclose all exculpatory evidence to the defense?

3. Did the trial court err in concluding that Myers was not entitled to relief based on his claims of prosecutorial misconduct?

We affirm.

The facts underlying Myers's conviction were set forth as follows in this court's opinion arising out of his direct appeal:

> In the spring of 2000, John Myers II lived approximately seven tenths of a mile from the intersection of North Maple Grove Road and West Maple Grove Road, at 1465 West Maple Grove Road, north of Bloomington in Monroe County. Myers was on vacation from work the week of May 29 through June 2.

> On the morning of May 31, 2000, Jill Behrman, an accomplished bicyclist who had just completed her freshman year at Indiana University, left her Bloomington home to take a bicycle ride. She logged off of her home computer at 9:32 a.m. Behrman did not report to the Student Recreational Sports Center, where she was scheduled to work from noon to 3:00 p.m. that day, nor did she appear at a postwork lunch scheduled with her father and grandparents. Following nationwide search efforts, Behrman's remains were ultimately discovered on March 9, 2003, in a wooded area near the intersection of Warthen and Duckworth Roads in Morgan County. The cause of her death was ruled to be a contact shotgun wound to the back of the head.

> With respect to the events surrounding Behrman's disappearance, one report indicated that a young woman matching Behrman's description was seen riding her bicycle north of Bloomington on North Maple Grove Road at approximately 10:00 a.m. the morning of May 31. A tracking dog later corroborated this report. While another report placed Behrman south of Bloomington at 4700 Harrell Road at approximately 9:38 a.m., some authorities later discounted this report

due to her log-off time of 9:32 a.m. and the minimum fourteen minutes it would take to bicycle to Harrell Road. The tracking dog did not detect Behrman's scent trail south of Bloomington.

At approximately 8:30 a.m. on the morning of May 31, 2000, in the North Maple Grove Road area, a witness saw a white "commercial looking" Ford van without identification on its doors or sides drive slowly past his driveway on North Maple Grove Road, heading south. Two men were inside the van. This witness saw the van two additional times that morning by approximately 9:00 a.m. and later identified the van as "exactly like" a Bloomington Hospital van.

At some point before noon on May 31, 2000, another witness saw a bicycle later determined to be Behrman's lying off of the east side of North Maple Grove Road near the intersection of North Maple Grove Road and West Maple Grove Road. The location of the bicycle was approximately one mile from Myers's residence and ten and one-half miles from Behrman's house.

On May 31, the date of Behrman's disappearance, two witnesses separately noted that the windows in Myers's trailer were covered, which was unusual. One of these witnesses also observed that Myers's car was parked fifty yards from its normal location and remained out of sight from the road for approximately three days. Myers told this witness that he had parked his car in that secluded spot because he did not want anyone to know he was home.

Myers's account of his activities during his vacation week of May 29 through June 2 was reportedly that he was "here and there." Myers's employer at the time was the Bloomington Hospital warehouse, where he had access to two white panel Ford vans. Besides being "here and there," Myers indicated that he had been mostly at home, that he had gone to a gas station, and that he had gone to Kentucky Kingdom but found it was closed. Myers additionally stated that he and his girlfriend, Carly Goodman, had cancelled their plans to go to Myrtle Beach, South Carolina, and to Kings Island, Ohio, that week. Phone calls made from Myers's trailer on May 31 were at the following times: 9:15 a.m.; 9:17 a.m.; 9:18 a.m.; 10:37 a.m.; 10:45 a.m.; and 6:48 p.m.

Myers's mother, Jodie Myers, testified that she had made those calls.[1] The calls were to drive-in theaters and various state parks.

Myers was reportedly almost hysterical on May 31 and spoke of leaving town and never coming back. Myers's aunt, Debbie Bell, observed that Myers had been very depressed in the preceding month and believed that this was due to problems with his girlfriend. In late April 2000, Myers had called Bell because he had been having problems with his girlfriend and felt like "a balloon full of hot air about to burst."

Carly Goodman was Myers's girlfriend beginning in approximately late October 1999. In March of 2000, Myers took Goodman for a long drive through Gosport, "over a bridge where there was a creek and into some woods." Myers pulled his car into a clearing in the woods where the two of them argued, which scared Goodman. Although it was nighttime, Goodman observed the appearance of this clearing from the car's headlights. In late April or early May of 2000, Goodman broke off her relationship with Myers. Goodman denied that she and Myers had ever made plans to go to Myrtle Beach or to Kings Island the week of May 29.

On June 5, 2000, Bell again spoke with Myers. Myers mentioned that a girl had been abducted in the area, and he was afraid he would be blamed for it. Myers further stated that the girl's bicycle had been found about a mile from his house and that "they blame [him] for everything." Myers additionally asserted, "[T]hey haven't found her body yet" and guessed that the girl was dead. In that same conversation, Myers indicated that he had been stopped by a

---

[1] Myers asserts that this is an inaccurate reflection of the record. After reviewing Jodie Myers's testimony, we agree. Although a portion of her testimony, when viewed in isolation, appears to support the assertion that she made the phone calls on May 31, 2000, her testimony when read in its entirety reveals otherwise. Instead, Jodie testified that after obtaining her son's telephone records for that date, she called the listed numbers to determine to whom they belonged. It is apparent to us that the jury was not misled into believing that Jodie had placed the phone calls, and the State made no such argument. It is also apparent that this court's misunderstanding of the record had no impact on its resolution of Myers's direct appeal.

roadblock and was "scared" of roadblocks, but he later changed his mind, laughed, and said he was not really "scared."

Following a tip due to this conversation, on June 27, 2000, Detective Rick Crussen of the Bloomington Police Department interviewed Jodie and Myers's father, John Myers Sr., at their residence at 3909 West Delap Road. The following day, Detective Crussen interviewed Myers.

On June 27, 2000, immediately after Detective Crussen interviewed Myers's parents and the day before he interviewed Myers, Myers called his grandmother, Betty Swaffard, and asked to borrow $200. Myers told Swaffard he was unable to come to her house for the money because there were roadblocks on Maple Grove Road, and he did not want to leave his home. Myers additionally stated that he was a suspect in the Jill Behrman disappearance. Myers did not come to Swaffard's home for the money.

In July 2000, Bell noticed that John Myers Sr. was unusually nervous and agitated when in Myers's presence. Sometime in approximately August of 2000, Myers's brother, Samuel, who owned a twelve-gauge shotgun and had stored it at his parents' house on Delap Road since approximately 1997, noted that the gun was missing.

Myers raised the topic of Behrman's disappearance multiple times and in multiple contexts following her disappearance. Before Detective Crussen interviewed him, Myers falsely stated to his Bloomington Hospital supervisor that police had questioned him in connection with Behrman's disappearance because her bicycle was found close to his home. Also in June of 2000, Myers stated to a co-worker that he wondered whether authorities had investigated a barn in a field located on Bottom Road off of Maple Grove Road. Additionally, some weeks after Behrman disappeared, Myers told another co-worker during a delivery run that Behrman's bicycle was found in his neighborhood, and that Behrman was probably abducted near that site. Later in 2000 or 2001, while driving with his then-girlfriend, Kanya Bailey, Myers directed Bailey's attention to a location a short distance from his mother's residence and stated he had found Behrman's bicycle there.

In the late spring to late summer of 2001, Myers again raised the topic of Behrman's disappearance with another co-worker. As the two were driving on Bottom and Maple Grove Roads, Myers pointed out where he lived and stated that Behrman's bicycle had been found close to where he used to live. A short time later, while on Maple Grove Road, Myers stated that if he was ever going to hide a body he would hide it in a wooded area up "this way," pointing north. On another occasion, Myers stated to this co-worker that he knew of someone in Florida who had Behrman's identification card or checkbook.

Sometime in November or December of 2001, Myers raised the topic of Behrman's disappearance with a family member, indicating his bet that Behrman would be found in the woods. During this conversation, Myers further indicated his familiarity with the Paragon area and with Horseshoe Bend, where he liked to hunt.

Also in 2001, Myers stated to his mother, Jodie, that he had been fishing in a creek and had found a pair of panties and a bone in a tree. Jodie suggested that this might be helpful in the Behrman case, and Myers agreed to call the FBI. FBI Agent Gary Dunn later returned the call and left a message. Myers told Jodie that they should save the answering machine tape in case they were questioned.

Sometime in 2002, Wendy Owings confessed to Behrman's murder, claiming that she, Alicia Sowders-Evans, and Uriah Clouse struck Behrman with a car on Harrell Road, stabbed her with a knife in her chest and heart, wrapped her body in plastic tied with bungee cords, and disposed of her body in Salt Creek. In September 2002, authorities drained a portion of Salt Creek. They found, among other things, a knife, a bungee cord, and two sheets of plastic. Owings later recanted her confession.

On March 27, 2002, Myers, who at the time was in the Monroe County Jail on an unrelated charge, told Correctional Officer Johnny Kinser that he had found some letters in some food trays one morning that he believed Kinser should look at, apparently in connection with the Behrman disappearance. Myers said he felt bad about what had happened to that "young lady" and that he wished to help find her if

he could. Myers additionally compiled a list of places potentially providing clues to Behrman's location. Indiana State Police Trooper James Minton investigated the list, including gravel pits off of Texas Ridge Road between Stinesville and Gosport. A route from Gosport to the intersection of Warthen and Duckworth Roads in Morgan County passes by Horseshoe Bend.[2]

On March 9, 2003, Behrman's remains were discovered by a hunter in a wooded area near the intersection of Warthen and Duckworth Roads in Morgan County approximately thirty-five to forty yards from a clearing in the timber north of Warthen Road. Authorities recovered approximately half of the bones in Behrman's skeleton. No soft tissue remained. Six rib bones were among the bones missing from her skeleton. There was no evidence of stab or knife wounds, nor was there evidence of blunt force trauma. Investigators recovered a shotgun shell wadding from the scene, as well as 380 number eight shot lead pellets. The wadding found at the scene was typical of a twelve-gauge shotgun shell wadding. The cause of Behrman's death was ruled to be a contact shotgun wound to the back of the head. Scattered skull fragments and the presence of lead pellets in a variety of places, together with certain soil stains consistent with body decomposition, suggested that after being shot, Behrman's body had come to rest and had decomposed at the spot where it was found. No clothing was found at the scene. There is nothing in the record to clarify whether Behrman's clothing, if it had been left at the scene, would or would not have completely disintegrated prior to her body being found.

In March 2003, Myers told another co-worker, who had brought a newspaper to work announcing the discovery of Behrman's remains, that the woods pictured in the newspaper article looked familiar to him, and that he had hunted there before. According to this co-worker, the woods pictured in the newspaper article did not appear

---

[2] Myers asserts that this court's opinion in his direct appeal reflects a misunderstanding concerning the content of the list of locations Myers compiled. Myers apparently believes that the opinion stated that the note listed a route to the site at which Behrman's remains were eventually discovered. The opinion contains no such assertion. Instead, the court noted that a route between Gosport, near one of the places on the list, and the area where Behrman's remains were later found passes by Horseshoe Bend, an area where Myers liked to hunt.

distinctive. Myers also stated that it was good that Behrman had been found and that he was surprised that he had not been contacted because he knew the people who police thought had committed the crime. Myers knew Wendy Owings, who had falsely confessed to the crime, as well as Uriah Clouse and Alicia Sowders-Evans. Myers had a "cocky" tone of voice when he made these comments, according to the co-worker.

More than a year later, in November 2004, Myers called his grandmother, Swaffard. Myers, who was upset and stated that he needed time to himself, said to Swaffard, "Grandma, if you just knew the things that I've got on my mind. [I]f the authorities knew it, I'd be in prison for the rest of my life." Myers further stated that his father, John Myers Sr., "knew" and had "[taken] it to the grave with him." Subsequently, when Myers arrived at Swaffard's house, he said with tears in his eyes, "Grandma, I wish I wasn't a bad person. I wish I hadn't done these bad things."

Indiana State Police Detectives Tom Arvin and Rick Lang interviewed Myers again on May 2, 2005. During this taped interview, Myers denied having told anyone in his family that he was "scared" of the roadblocks or that he had talked to anyone besides the police about the case. Also in May of 2005, Myers, who was again in the Monroe County Jail on an unrelated charge, mentioned to his bunkmate that the state police were investigating him because Behrman's bicycle had been found in the vicinity of his house. Myers made approximately three or four references to Behrman's bicycle and was nervous and pacing at the time. During that conversation, Myers, who was also angry, made reference to the "bitch," and stated to this bunkmate, "[I]f she [referring to Behrman] wouldn't have said anything, . . . none of this would have happened."

On February 17, 2006, Detective Lang took Goodman on a thirty-six-mile drive north of Myers's home on Maple Grove Road and into rural Morgan County. Goodman recognized a clearing in the woods near the corner of Warthen and Duckworth Roads, approximately thirty-five to forty yards from where Behrman's remains were discovered, as the place that Myers had driven her in March 2000.

*Myers v. State*, 887 N.E.2d 170, 176-80 (Ind. Ct. App. 2008) (footnotes and citations to the record omitted), *trans. denied*. A grand jury indicted Myers for Behrman's murder in April 2006. A twelve-day jury trial commenced on October 16, 2006, at the conclusion of which Myers was found guilty as charged and sentenced to a term of sixty-five years. This court affirmed Myers's conviction on direct appeal and our Supreme Court denied transfer.

[4] Myers filed a pro se PCR petition on February 2, 2009. Counsel subsequently entered appearances on Myers's behalf and amended the petition. An evidentiary hearing was held over several days in April and May 2013, at the conclusion of which the post-conviction court took the matter under advisement. The post-conviction court issued its written order denying Myers's PCR petition on November 18, 2013. Myers now appeals.

[5] In a post-conviction proceeding, the petitioner bears the burden of establishing grounds for relief by a preponderance of the evidence. *Bethea v. State*, 983 N.E.2d 1134 (Ind. 2013). "When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id.* at 1138 (quoting *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004)). In order to prevail, the petitioner must demonstrate that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite the post-conviction court's conclusion. *Bethea v. State*, 983 N.E.2d 1134. Although we do not defer to a post-conviction court's legal conclusions, we will reverse its findings and judgment only upon a showing of clear error, i.e., "that which

leaves us with a definite and firm conviction that a mistake has been made." *Id.* at 1138 (quoting *Ben–Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000)).

1.

[6]  Myers first argues that his trial counsel were constitutionally ineffective.[3]  A petitioner will prevail on a claim of ineffective assistance of counsel only upon a showing that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the petitioner. *Bethea v. State*, 983 N.E.2d 1134.  To satisfy the first element, the petitioner must demonstrate deficient performance, which is "representation that fell below an objective standard of reasonableness, committing errors so serious that the defendant did not have the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 1138 (quoting *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002)).  To satisfy the second element, the petitioner must show prejudice, which is "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different."  *Id.* at 1139.  "A reasonable probability is one that is sufficient to undermine confidence in the outcome." *Kubsch v. State*, 934 N.E.2d 1138, 1147 (Ind. 2010) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

[7]  There is a "strong presumption" that counsel rendered adequate service. *Bethea v. State*, 983 N.E.2d at 1139.  "We afford counsel considerable discretion in

---

[3] Myers was represented at trial by the father-son defense team of Hugh and Patrick Baker, with Patrick Baker acting as lead counsel.  Except where we find it necessary to differentiate between the two, we will refer to both Bakers collectively as "trial counsel."

choosing strategy and tactics, and '[i]solated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.'" *State v. Hollin*, 970 N.E.2d 147, 151 (Ind. 2012) (quoting *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001)) (alteration in original). Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington*, 466 U.S. at 690-91. Moreover, because a petitioner must prove both deficient performance and prejudice in order to succeed, the failure to prove either element defeats the claim. *See Young v. State*, 746 N.E.2d 920 (Ind. 2001) (holding that because the two elements of *Strickland* are separate and independent inquiries, the court may dispose of the claim on the ground of lack of sufficient prejudice if it is easier). Myers has raised numerous claims of ineffective assistance of trial counsel. We address them each in turn.

## A.

[8] Myers raises a number of arguments with respect to the admission into evidence of a redacted version of his May 2, 2005 police interrogation. First, he argues that trial counsel were ineffective for agreeing to the redactions because portions of the statement in which he denied any involvement in Behrman's disappearance and murder were excised, and those statements would have been helpful to the defense.

[9] The interrogation in question was conducted in two parts. In the first part of the interview, Myers was questioned by Indiana State Police Detectives Rick Lang and Tom Arvin, and Myers repeatedly denied any involvement in or knowledge of Behrman's disappearance and murder. Myers was then arrested on a separate charge of receiving stolen property, booked, fingerprinted, and swabbed for DNA. Thereafter, a second, post-arrest interview was conducted by Detective Jeff Heck, during which Myers again denied any involvement in Behrman's disappearance and murder. The State, defense, and trial court spent a substantial amount of time discussing redactions of the interrogation. Ultimately, the jury heard an audio recording of and was provided with a written transcript of the partially redacted pre-arrest interview; the post-arrest interview was omitted entirely. Myers does not appear to object to the manner in which the pre-arrest interview was redacted. Instead, he argues that the jury should also have heard the post-arrest interview.

[10] We have reviewed both the redacted and unredacted interrogation, and Myers has not established either deficient performance or prejudice stemming from the redaction of the post-arrest interview. The post-arrest interview contained several long monologues in which the interviewer attempted to appeal to Myers's moral sensibilities, followed by relatively short responses from Myers. Some of these monologues spanned several pages of transcript and made specific reference to Myers's past substance abuse and recovery process. The trial court described the post-arrest interview as largely filled with "a lot of irrelevant gibberish" that "add[ed] nothing to the factual determination in this

case." *Trial Transcript* at 26. We think this is a fair characterization. Although Myers continued to proclaim his innocence in the post-arrest interview, his denials of involvement were merely cumulative of his previous statements in the pre-arrest interview, which the jury heard. Myers also made statements in the post-arrest interview that the jury could have viewed as flippant under the circumstances. For example, at one point, Myers stated, "you know, as we're sitting there talking, I'm thinking cigarettes, I'm thinking coffee[.]" *PCR Exhibit* 305A at 154. It was not deficient performance for trial counsel to agree to redact the post-arrest interview in its entirety because it could have harmed Myers and, in any event, would have added little, if anything, to the pre-arrest interview. For the same reason, Myers was not prejudiced by the redaction.

[11]     Myers also argues that counsel performed deficiently by failing to object to portions of Detective Arvin's and Detective Lang's testimony concerning the May 2, 2005 interrogation. Specifically, Myers notes that counsel did not object to Detective Arvin's testimony that Myers's demeanor during the interview was "nonchalant" and "cavalier" and that his answers appeared to be rehearsed. *Trial Transcript* at 2207. Additionally, on cross-examination by trial counsel, Detective Arvin asserted that Myers never "adamantly" or "expressly" denied guilt. *Id.* at 2211-12. In response to a jury question, Detective Arvin again testified that Myers's demeanor was nonchalant and cavalier. Additionally, Detective Lang testified that he did not expect Myers to confess to the murder based on his "prior intelligence" and because "murder is one of the

least things someone is going to confess to." *Id.* at 2380-81. According to Myers, these statements constituted inadmissible opinion testimony.

[12] The sum total of Myers's argument that this testimony was inadmissible is contained in the following conclusory statement in his appellant's brief: "The opinion evidence offered by [Detective] Arvin was objectionable, irrelevant and prejudicial. Ind. Evidence Rule 701; *Hensley v. State*, 448 N.E.2d 665, 667 (Ind. 1983) (lay witnesses may not give opinions where jury is well qualified to form an opinion)." *Appellant's Brief* at 28-29. Assuming *arguendo* that the testimony was objectionable, Myers has not established prejudice. With respect to Detective Arvin's testimony that Myers never adamantly or expressly denied guilt, trial counsel went on to elicit testimony clarifying that Myers had, in fact, denied involvement in Behrman's disappearance and murder "numerous" times. *Trial Transcript* at 2211. With respect to the characterizations of Myers's responses as rehearsed and his demeanor as nonchalant and cavalier, the jury heard the audio recording of the redacted interview and received a written transcript thereof, and was therefore able to draw its own conclusions as to whether Myers's responses and tone were inappropriately casual. Myers has made no attempt to explain how Detective Lang's testimony that he did not expect Myers to confess prejudiced him, and we are unable to imagine how it might have done so. Myers has not established that the outcome of the trial would have been different had his trial counsel objected to this testimony.

[13] Finally, Myers takes issue with trial counsel's failure to challenge the State's characterization of the May 2, 2005 interrogation in its opening statement and

closing argument. Specifically, Myers takes issue with the prosecutor's assertion in opening statements that Myers's demeanor was nonchalant—but, as we explained above, the jury heard Myers's interview and was able to draw its own conclusions in this regard. Myers also notes that the State used a Powerpoint slide presentation in its closing argument, and several of the slides included claims that Myers never denied guilt. The presentation consisted of over sixty slides, five of which bore the subheading "When pressed Defendant never denies guilt", followed by excerpts from the transcript of Myers's interrogation. *PCR Exhibit* 132. We note, however, that the slide presentation was not admitted as an exhibit at trial; instead, it was used by the State solely as a visual aid during closing arguments. Moreover, our review of the trial transcript reveals that the State did not verbally assert in its closing argument that Myers never denied guilt. The defense, on the other hand, emphasized in its closing argument that Myers repeatedly denied guilt during his police interrogation. Most importantly, the jury was provided a transcript and heard an audio tape of the interrogation, during which Myers repeatedly denied any involvement in Behrman's disappearance and murder. Under these facts and circumstances, we cannot conclude that Myers has established that he suffered prejudice as a result of trial counsel's failure to object to the use of the slides.

### B.

[14] Next, Myers argues that trial counsel Patrick Baker was ineffective for telling the jury in opening statements that the defense would present certain evidence, and then failing to do so. Specifically, during opening statements, Patrick

Baker stated that during a search for Behrman shortly after her disappearance, a bloodhound alerted to the residence of Brian Hollars, who trial counsel had identified as an alternative suspect, but that the dog was called off. Counsel also told the jury that there was evidence that Hollars and Behrman were seen arguing days before she disappeared. Trial counsel did not present evidence to support these claims.

[15] The parties acknowledge that Patrick Baker was professionally disciplined for, among other things, stating that a dog had alerted at Hollars's home. *See In re Baker*, 955 N.E.2d 729 (Ind. 2011). Our Supreme Court found that "[t]hese statements were false and Respondent should have known that no evidence would be admitted at trial to support them." *Id.* at 729. The court noted, however, that there was no allegation in the disciplinary proceedings that counsel had provided substandard services to Myers or that Myers or the State were prejudiced by the misrepresentation in his opening statement. We will presume, however, that an attorney who tells the jury that he will present evidence that he either knows or should know will not be presented has acted unreasonably for the purposes of the *Strickland* analysis. Thus, at least with respect to trial counsel's statement that a search dog alerted to Hollars's residence, we accept Myers's argument that trial counsel's performance was deficient. We are left to consider whether the statements prejudiced Myers within the meaning of *Strickland*.

[16] In support of his argument that trial counsel's unfulfilled promise in this regard amounted to ineffective assistance of counsel, Myers directs our attention to

two decisions of the United States Court of Appeals for the Seventh Circuit: *United States ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003) and *Barrow v. Uchtman*, 398 F.3d 597 (7th Cir. 2005). As this court has explained, "although decisions of the Seventh Circuit 'are entitled to our respectful consideration,' its decisions on questions of federal law are not binding on state courts." *Jackson v. State*, 830 N.E.2d 920, 921 (Ind. Ct. App. 2005). Even so, we conclude that the cases cited do not mandate the conclusion that Myers's trial counsel was ineffective.

[17] In *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, the Seventh Circuit found that Hampton's trial counsel was ineffective for failing to investigate exculpatory eyewitnesses to the crime. The court also considered Hampton's argument that his trial counsel was ineffective for failing to fulfill two promises made during opening statement. First, Hampton's trial counsel stated that Hampton would testify that he was not involved in the gang-related attack for which he was on trial, and second, that the evidence would show that Hampton was not a member of or involved with any gang.

[18] The court explained that unforeseeable developments at trial may justify reversals of this nature, but that "when the failure to present the promised testimony cannot be chalked up to unforeseeable events, the attorney's broken promise may be unreasonable, for 'little is more damaging than to fail to produce important evidence that had been promised in an opening.'" *Id.* at 257 (quoting *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988)). The court concluded that to the extent trial counsel had legitimate reasons to conclude

that Hampton should not testify, those reasons should have been obvious from the outset of the case. In reaching its conclusion that counsel's performance was unreasonable, the court emphasized the fact that trial counsel had explicitly promised the jury that Hampton himself would testify, reasoning that "Hampton's unexplained failure to take the witness stand may well have conveyed to the jury the impression that in fact there was no alternate version of the events that took place, and that the inculpatory testimony of the prosecution's witnesses was essentially correct." *Id.* at 258.

[19] The court also found trial counsel's failure to present testimony that Hampton was not involved with a gang unreasonable, noting that such evidence would bear on the likelihood that he had participated in a crime with "unmistakable gang overtones." *Id.* at 259. Testimony of this nature was readily available to counsel; he simply failed to pursue it. The court concluded that counsel's failure to present such evidence "could only have undercut the credibility of the defense with the jury." *Id.* With respect to the prejudice element of the *Strickland* standard, however, the court concluded that trial counsel's "breach of the promises he made in the opening statement was not so prejudicial that it would support relief in and of itself[.]" *Id.* at 260. Rather, the breach "serve[d] to underscore the more important failure to investigate exculpatory occurrence witnesses." *Id.*

[20] In *Barrow v. Uchtman*, 398 F.3d 597, the Seventh Circuit again encountered a claim that counsel was ineffective for failing to deliver on promises made during opening statements. In *Barrow*, trial counsel in opening statement informed the

jury that "we will tell you about" the crime and the defendant's denial of involvement. *Id.* at 606 n.7. During the trial, however, Barrow's counsel presented no evidence whatsoever in defense. The court concluded that Barrow had not established that he was prejudiced by trial counsel's failure to deliver on his promise to present exculpatory evidence. In reaching this conclusion, the court carefully distinguished *Hampton*, noting that in that case, the court had "placed special importance on the fact that trial counsel had specifically promised the jury that the defendant would testify *himself*." *Id.* at 606 (emphasis in original). Barrow's counsel, on the other hand, made no explicit promise that Barrow would testify; rather, he promised to present other exculpatory evidence. The court also noted that the nature of the evidence against Barrow was qualitatively different from that in *Hampton*. In *Hampton*, the sole evidence against the defendant was eyewitness testimony, but the primary evidence against Barrow was his own confession. Under these circumstances, Barrow's personal testimony was far less critical than Hampton's. Moreover, the content of Barrow's proposed testimony was unlikely to have altered the ultimate verdict given the abundant evidence against him. Thus, the court concluded, Barrow could not establish that he was prejudiced by his trial counsel's unfulfilled promises.

[21]     Like the court in *Barrow*, we also conclude that Myers was not prejudiced by trial counsel's unfulfilled promises. First, we note that trial counsel made no promise that Myers himself would testify. Patrick Baker's representations that evidence would be presented that a dog had followed Behrman's scent to

Hollars's residence and that Hollars and Behrman had been seen arguing shortly before her disappearance are more akin to the promises of trial counsel in *Barrow* to present exculpatory evidence.

[22] Moreover, although trial counsel failed to deliver on these specific promises, other evidence casting suspicion on Hollars was presented to the jury. Evidence was presented establishing that Hollars had hired Behrman to work at Indiana University's Student Recreational Sports Center (SRSC) and that Hollars and Behrman shared an interest in cycling. In fact, Hollars had given Behrman his telephone number because he was trying to sell a bicycle and believed someone in Behrman's cycling club might be interested. Becky Shoemake, who was Behrman's cousin, roommate, and closest friend on campus, testified that Behrman had confided in her that an older man had asked her out and that Behrman was concerned because the man was old enough to drink, but Behrman was not. Shoemake did not know the man's identity or if Behrman accepted the date. Detective Lang testified that Behrman's mother had told him that Behrman was probably sexually active during her second semester. Trial counsel admitted into evidence condoms, a pregnancy test, a package of emergency contraceptive pills, and several books on pregnancy found in Behrman's room. Behrman's mother told Detective Crussen that Hollars had called the Behrman residence three or four times on June 1, 2000, which she found strange. Evidence was also presented that Hollars was married and that he owned a twelve-gauge shotgun and loaded his own shotgun shells using number eight shot, the same size used in Behrman's

murder. Importantly, the jury was presented with evidence that a bloodhound tracked Behrman's scent near Hollars's residence. Hollars testified that he was questioned by police on the day of Behrman's disappearance and again by Detective Arvin in 2003, and he believed that he was under suspicion.

[23] From the jurors' questions, it is clear that the jury considered the possibility of Hollars's involvement in Behrman's murder. A juror asked Behrman's mother questions about when Behrman first met Hollars. Additionally, a juror asked Wes Burton, Behrman's supervisor at the SRSC, whether Hollars was romantically interested in Behrman. The jurors also wanted to know whether written records could corroborate Hollars's and Burton's recollections that they had been working together at the SRSC at the time Behrman went missing. A juror also asked if Hollars had left the SRSC at any time on May 31, 2000, and Hollars admitted that he had left the premises to check on athletic fields.

[24] The jurors also took note of the possibility that Behrman was pregnant. A juror asked Behrman's mother if Behrman had appeared to be sick, nauseated, fatigued, or lightheaded, and Behrman's mother recalled that Behrman had felt poorly one morning in May. A juror also asked Behrman's mother if she believed Behrman would have confided in her if she had been pregnant. The jurors did not, however, question the canine handler who testified concerning the bloodhound search conducted a few days after Behrman's disappearance about trial counsel's claim that a dog had alerted at Hollars's residence but been pulled off. We therefore conclude that counsel has not established prejudice stemming from trial counsel's failure to fulfill his promise to present evidence

that the bloodhound alerted to Hollars's residence and that Hollars was seen arguing with Behrman shortly before her disappearance.

[25] Myers also argues that Patrick Baker was ineffective for failing to deliver on his claim in opening statement that Carl Salzman, the Monroe County Prosecutor at the time of Behrman's disappearance, would testify that Myers was never a suspect and that Owings, Sowders-Evans, and Clouse were his primary suspects. In support of this argument, Myers directs our attention to Salzman's deposition testimony, taken just days before trial, in which Myers claims Salzman "said exactly the opposite[.]" *Appellant's Brief* at 31.

[26] Myers overstates Salzman's deposition testimony. Salzman testified in his deposition that his office investigated Behrman's disappearance until her remains were discovered in Morgan County, at which time the investigation was turned over to Morgan County officials. Salzman testified that during the Monroe County investigation, he never filed charges against anyone in Behrman's disappearance. Salzman was presented with a probable cause affidavit for Wendy Owings, and he testified that the plan was to use the charge to get to Sowders-Evans and Clouse. Salzman declined to file charges against Owings because he did not believe the evidence was sufficient. Salzman was never presented with a probable cause affidavit for Myers.

[27] Salzman testified further that after Morgan County took over the investigation, he continued to receive tips from members of the community and jail inmates, which he would pass on to Detective Lang. One such tip came from Betty

Swaffard, Myers's grandmother, who told Salzman that Myers had been behaving strangely at the time of Behrman's disappearance. Salzman found Swaffard to be credible and her story to be compelling, so he passed it on to Detective Lang and urged him to investigate further. Thus, from Salzman's testimony, it is apparent that Myers was not presented to Salzman as a suspect during Salzman's official investigation as the Monroe County Prosecutor. While it appears that Salzman eventually came to personally suspect Myers based on Swaffard's testimony, this occurred well after his official involvement in the case ended. During the Monroe County investigation, the only person Salzman considered charging was Wendy Owings. Thus, while Patrick Baker's assertion that Myers was not one of Salzman's suspects could have been clearer, it was not demonstrably false.

[28] Nevertheless, because Salzman did not testify at trial, Patrick Baker's promise concerning the substance of his testimony necessarily went unfulfilled. We note, however, that at the PCR hearing, Myers elicited no testimony from trial counsel concerning the failure to call Salzman as a witness. Because Myers has made no attempt to discount the possibility that trial counsel made a strategic decision not to call Salzman to testify, he has not satisfied his burden of establishing deficient performance on this issue. *See United States ex rel. Hampton v. Leibach*, 347 F.3d 219 (explaining that unexpected developments at trial may justify an attorney's decision not to present evidence promised in opening statements); *Specht v. State*, 838 N.E.2d 1081, 1087 (Ind. Ct. App. 2005) (explaining that "an action or omission that is within the range of reasonable

attorney behavior can only support a claim of ineffective assistance if that presumption is overcome by specific evidence as to the performance of the particular lawyer"), *trans. denied.* Nor has he established sufficient prejudice to justify relief on this basis. The jury was presented with ample evidence that the initial investigation focused on Owings, Sowders-Evans, and Clouse, and that Myers was not developed as the primary suspect until much later. Under these facts and circumstances, we cannot conclude that trial counsel's failure to elicit testimony from Salzman on this issue had an appreciable impact on the jury.

## C.

[29] Next, Myers argues that trial counsel were ineffective for failing to adequately undermine the State's theory that Behrman had ridden her bicycle north on North Maple Grove Road, i.e., in the direction of Myers's residence, on the date she disappeared. According to Myers, it was crucial for the defense to establish that Behrman took a route south of Bloomington that morning because if she did so, phone records placing Myers at his residence that morning would have exonerated him.

[30] Myers's arguments on this issue presume that the only reasonable strategy trial counsel could have pursued was one that depended heavily on establishing that Behrman rode south rather than north on the date of her disappearance. But trial counsel were not limited to presenting a single theory of defense. Indeed, in a case such as this, based solely on circumstantial evidence, the most advantageous approach may be to establish reasonable doubt by presenting

multiple possible alternative theories of the crime that point away from the accused's guilt. As the U.S. Supreme Court has explained, "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Harrington v. Richter*, 562 U.S. 86, 109 (2011).

[31] At the PCR hearing, when asked what he wanted the jury to believe concerning Behrman's bicycle route, Patrick Baker initially stated that he "didn't want her going north." *PCR Transcript* at 598. He went on to clarify, however, that he had "two theories, a southern route and a northern route". *Id.* Specifically, he testified as follows:

> We wanted the jury to believe that she couldn't have made it to [Myers's] house and back in time for work. So I don't know if we differentiated between the southern route and maybe partially of the northern route but we wanted the jury to believe that she couldn't have ridden to his house and back.

*Id.* at 598-99. Thus, it was not trial counsel's strategy to eliminate the possibility that Behrman had ridden north—rather, trial counsel sought to establish that Behrman would not have followed the north route all the way to Myers's residence in light of her schedule that day.

[32] We cannot conclude that trial counsel's decision to pursue a defense theory that allowed for the possibility that Behrman had ridden north was unreasonable. As an initial matter, we note that trial counsel presented evidence supporting the theory that Behrman had ridden south. Trial counsel elicited testimony that

Maral Papakhian, a high school classmate of Behrman's, had reported seeing Behrman riding her bike on Harrell Road, i.e., the southern route, on the morning of her disappearance. The jury was also presented with evidence of Owings's confession, in which she stated that she and Sowders-Evans had been passengers in Clouse's vehicle when he struck Behrman and abducted her on Harrell Road. Additionally, in both opening statements and closing arguments, trial counsel argued that the evidence presented supported a conclusion that Behrman had ridden south.

[33] We also note, however, that trial counsel's Hollars theory was premised in part on the fact that a bloodhound had scented Behrman on the northern route near Hollars's residence. Thus, presenting a theory of defense that depended on proving to a certainty that Behrman had ridden south would have undermined this alternative theory. Moreover, there was other evidence that Behrman had ridden north. Robert England testified that he saw a cyclist matching Behrman's description riding north on Maple Grove Road either at 10:00 a.m. on the day Behrman disappeared or at 9:00 a.m. the next day. Moreover, Behrman's bike was discovered on the north route, less than one mile from Myers's residence. Although it has been suggested that Behrman could have taken the south route, been abducted and subdued there, and her bike dumped on the north route, the timeline for such a scenario is tight. Behrman logged off of her computer at 9:32 a.m. and her bike was spotted near Myers's residence "before noon." *Trial Transcript* at 1226. Additionally, evidence from the bloodhound tracking search was consistent with Behrman having ridden the

bike to its final location as opposed to being driven there in a vehicle. Thus, although it is not impossible for the bike to have been dumped, we cannot conclude that it was unreasonable for trial counsel to decline to pursue a theory of defense that was wholly dependent on the jury reaching such a conclusion. While it might have been helpful to the defense to conclusively eliminate the possibility that Behrman had ridden north that morning, the evidence simply did not allow for such certainty.

[34] Moreover, none of the evidence Myers argues should have been used to impeach the theory that Behrman rode north was particularly strong. For example, Myers argues that trial counsel should have established that shortly after Behrman's disappearance, police investigated routes south and east of Bloomington. Considering the breadth of the investigation in this case and the fact that investigators were simultaneously investigating possible routes north of Bloomington, such evidence was unlikely to impress the jury. Myers also suggests that evidence should have been presented to the effect that investigators and Behrman's family believed "[f]or years" that Behrman had ridden south. *Appellant's Brief* at 33. But the jury was well aware that investigators primarily pursued Owings's confession, which placed Behrman on the south route, until Behrman's remains were discovered.

[35] Myers also argues that trial counsel should have cross-examined Behrman's parents "on their prior belief their daughter would not have ridden north based on the limited time she had, her riding habits and her habits preparing for work and leaving the house." *Id.* at 33. The PCR court found that declining to

pressure the Behrmans about the specifics of their daughter's bike route reflected a valid trial strategic decision to avoid alienating the jury by upsetting grieving parents.[4] In any event, Behrman's parents clearly did not know which direction she had ridden that day, and we cannot conclude that cross-examining them as to their guesses on the matter would have had a significant impact on the jury. Finally, Myers argues that trial counsel should have impeached the testimony of Dr. Norman Houze, a cyclist who conducted a timed ride from the Behrman residence to the location where Behrman's bike was discovered, with evidence that the ride was accomplished with a police escort.[5] But Myers has not directed our attention to any evidence suggesting that the police escort had an appreciable impact on the speed at which the ride was conducted. For all of these reasons, we also conclude that Myers has not established the requisite prejudice.

[36]     Myers also argues that trial counsel were ineffective for failing to object to hearsay testimony discrediting Papakhian's sighting of Behrman on Harrell Road on the morning of her disappearance. Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted. *Boatner v. State*, 934 N.E.2d 184 (Ind. Ct. App. 2010). As a general rule, hearsay is

---

[4] Myers argues that trial counsel was not concerned about alienating the jury because Patrick Baker cross-examined Behrman's mother extensively about "whether her murdered daughter might have been pregnant with a married man's baby." *Appellant's Brief* at 34. We note, however, that Patrick Baker testified at the PCR hearing that he believed that evidence concerning a possible pregnancy was crucial. It was not unreasonable for trial counsel to forego intense cross-examination on other, less important issues in order to avoid appearing antagonistic.

[5] The results of the timed ride suggested that Behrman might have been able to take the northern route and still make it to work at the SRSC in time for her shift. Trial counsel cross-examined Dr. Houze extensively.

inadmissible unless the statement falls within one of the established hearsay exceptions. *Yamobi v. State*, 672 N.E.2d 1344 (Ind. 1996).

[37] Detective Arvin testified that Papakhian told police she believed she saw Behrman on the 4700 block of Harrell Road on the morning of Wednesday, May 31, but that she could not be one hundred percent certain that she had not seen her on Tuesday. Detective Arvin testified further that when he interviewed Papakhian, she recalled having an argument with her boyfriend at a small party the night before the sighting, and she named several other people who had attended the party. Detective Arvin testified that he interviewed five people as a result of his interview with Papakhian, and that he ultimately reported to Detective Lang "that the timeline that [Papakhian] had presented did not fit." *Trial Transcript* at 2203. He testified further that based on his investigation, he believed that it was more likely that Papakhian had seen Behrman on Tuesday, the day before her disappearance. Detective Arvin explained that Papakhian told him that she regularly left her house forty-five minutes before her 10:20 a.m. class (i.e., at 9:35 a.m.) and Detective Arvin determined that it would take her only three minutes to drive to the 4700 block of Harrell Road. Because Behrman had logged off of her computer at 9:32 a.m., and it would take a minimum of fifteen minutes for her to bike from the Behrman residence to Harrell Road (not including additional time to change clothes, put on cycling shoes, fill a water bottle, etc.), Detective Arvin believed that Behrman could not have made it to the 4700 block of Harrell Road in time for Papakhian to have seen her there on the date of her disappearance.

[38] Myers argues that Detective Arvin testified to statements made to him by the other partygoers Papakhian identified, and that a hearsay objection to this testimony would have been sustained.[6] But Myers has not directed our attention to a single out-of-court statement made by these unnamed individuals and admitted into evidence through Detective Arvin's testimony. Instead, Detective Arvin testified that after interviewing Papakhian and five other witnesses, he came to the conclusion that Papakhian's timeline did not fit and she had probably seen Behrman on Tuesday. When giving a further explanation of why he reached the conclusion, Detective Arvin referred not to any statements or information gathered from the partygoers, but to the timeline he had worked out based on Papakhian's statements and Behrman's computer logoff time. Because Myers has not established that Detective Arvin testified to any out-of-court statements made by the unnamed witnesses he interviewed, Myers has not established that trial counsel were ineffective for failing to object based on hearsay.

## D.

[39] Myers also argues that his trial counsel were ineffective for failing to object to the admission of evidence of a bloodhound tracking search, or alternatively for failing to impeach the reliability of such evidence. At trial, Porter County

---

[6] Myers makes no argument that counsel should have objected when Detective Arvin testified at length to out-of-court statements made by Papakhian, and for good reason. Because Papakhian did not testify at trial, the only way to get evidence of her sighting before the jury was through the testimony of others. Myers makes no argument that trial counsel were ineffective for failing to call Papakhian as a witness, and Papakhian did not testify at the PCR hearing.

Sheriff's Deputy and canine handler Charles Douthett testified concerning a search he performed with his bloodhound, Sam. Deputy Douthett testified that he had been working with Sam for over ten years, and that he and Sam had attended numerous seminars and trainings and worked homicide investigations in six states. Deputy Douthett testified further that he and Sam had conducted numerous real-world tracking searches, including some cases involving tracking bicyclists. Deputy Douthett went on to describe the process used to present a bloodhound with a scent and to track that scent.

[40]    Deputy Douthett testified further that the FBI contacted him and asked him to come to Bloomington to conduct a tracking search in the Behrman case. An exhaustive description of the tracking search is not necessary here. It suffices for our purposes to note that Deputy Douthett and Sam were taken to a spot on North Maple Grove Road roughly one-half mile southwest of where Behrman's bike had been discovered. Sam tracked Behrman's scent to the spot the bike had been found and continued tracking the scent northward briefly before losing the scent and doubling back to the starting point of the search. At that point, Deputy Douthett and Sam got into a vehicle and were driven southward along the path Sam had been following. They stopped and got out of the vehicle at an intersection a few hundred yards away from Highway 37. Hollars's residence is very close to this intersection. Sam was able to pick the scent back up at that point and she followed it across Highway 37 before turning south on Kinser Pike.

[41] Myers argues that evidence of the bloodhound tracking search was inadmissible, or at the very least subject to impeachment on the basis of its unreliability. In support of this argument, he cites a line of Indiana Supreme Court cases supporting the proposition that bloodhound tracking evidence is too unreliable to be admissible. *See Hill v. State*, 531 N.E.2d 1382 (Ind. 1989); *Brafford v. State*, 516 N.E.2d 45 (Ind. 1987); *Ruse v. State*, 186 Ind. 237, 115 N.E. 778 (Ind. 1917). The State notes, however, that all of these cases were decided prior to the adoption of the Indiana Rules of Evidence. In his reply brief, Myers appears to concede that the line of cases he cited in his appellant's brief are no longer controlling. Instead, he argues that the admission of the bloodhound tracking evidence would now be evaluated under Indiana Evidence Rule 702(b), which provides that "[e]xpert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles." According to Myers, the application of Rule 702(b) would result in the exclusion of bloodhound tracking evidence because "[a] dog's accuracy relies upon too many variant and subjective factors to be considered reliable". *Reply Brief* at 8. Myers also argues that even if bloodhound tracking evidence might be deemed admissible under the current rules of evidence, trial counsel were ineffective for failing to impeach the evidence by establishing its unreliability.

[42] We need not address whether the bloodhound tracking evidence in this case was admissible or subject to impeachment. "[A]n objection to inadmissible evidence may be waived as part of reasonable trial strategy, which will not be

second-guessed by this court." *Nordstrom v. State*, 627 N.E.2d 1380, 1385 (Ind. Ct. App. 1994), *trans. denied*. Trial counsel may also choose to forego opportunities to impeach evidence when doing so serves a reasonable strategic purpose. *See Kubsch v. State*, 934 N.E.2d 1136 (concluding that counsel's decision not to impeach a witness was a matter of trial strategy and did not amount to ineffective assistance).

[43] At the PCR hearing, Patrick Baker testified that he could not recall whether he considered objecting to the bloodhound tracking evidence. Likewise, he could not recall whether he considered consulting with an expert on bloodhounds or researched the admissibility of such evidence, although he believed he or someone in his office had probably done some research on the issue. He noted on cross-examination that the bloodhound evidence put Behrman within a reasonable proximity of Hollars's house around the time of her disappearance.

[44] It is Myers's burden to overcome the presumption that there were strategic reasons for the decisions trial counsel made. If Myers cannot satisfy that burden, he cannot establish deficient performance. Patrick Baker's inability to recall at the time of the PCR hearing whether he researched bloodhound evidence or considered objecting to its introduction at trial over six years earlier is insufficient to overcome the presumption in this case. This is so because we judge counsel's performance "by the standard of objective reasonableness, not his subjective state of mind." *Woodson v. State*, 961 N.E.2d 1035, 1041 (Ind. Ct. App. 2012) (citing *Harrington v. Richter*, 562 U.S. 86), *trans. denied*. "Although courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking

that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington v. Richter*, 562 U.S. at 109 (internal citation omitted).

[45] Judging trial counsel's performance by an objective standard of reasonableness, as we must, we conclude that there were valid strategic reasons for declining to object to or impeach the bloodhound tracking evidence irrespective of Patrick Baker's inability to recall his thoughts on the subject. One of trial counsel's tactics throughout trial was to cast suspicion on Hollars, and the bloodhound tracking evidence supported that strategy because it placed Behrman near Hollars's residence. Indeed, trial counsel relied on the bloodhound tracking evidence and its link to Hollars in both opening statements and closing arguments. We will not speculate on the ultimate wisdom of trial counsel's strategic decisions on this issue. Because Myers has not overcome the presumption that trial counsel acted competently in declining to object to or impeach the bloodhound tracking evidence, he has not established ineffective assistance in this regard.

E.

[46] Next, Myers argues that his trial counsel were ineffective for failing to impeach Betty Swaffard's testimony. Swaffard, Myers's maternal grandmother, testified to certain statements Myers made to her following Behrman's disappearance. Specifically, Swaffard testified that on June 27, 2000, the date Detective Crussen interviewed Myers's parents, Myers called Swaffard and asked to

borrow money. Swaffard told Myers that he would have to come to her house to pick up the money, and he said he could not come because there were road blocks up on Maple Grove Road, and he did not want to go out because he was a suspect in Behrman's disappearance. Swaffard testified further that in November 2004, Myers called her and asked her to look after his daughter because he needed some time alone to think. Swaffard asked what was on his mind, and Myers said, "Grandma, if you just knew the things that I've got on my mind. . . . [I]f the authorities knew it, I'd be in prison for the rest of my life." *Trial Transcript* at 1833. Myers stated further that his father had known it and "took it to the grave with him." *Id.* Later that evening, when Myers dropped his daughter off at Swaffard's house, he had tears in his eyes and said, "Grandma, I wish I wasn't a bad person. I wish I hadn't done these bad things." *Id.* at 1833-34. On cross-examination, trial counsel asked Swaffard only two questions, both of which were apparently intended to establish that Swaffard had developed an unusually close relationship with Detective Lang. First, counsel asked Swaffard whether she knew Detective Lang's telephone number, and she responded affirmatively. Second, counsel asked what Detective Lang's phone number was, and Swaffard began to answer but was interrupted by an objection from the State. The trial court sustained the objection, and trial counsel declined to cross-examine Swaffard further.

[47] On appeal, Myers argues that trial counsel were ineffective for failing to use recordings of telephone conversations between Myers and Swaffard to impeach Swaffard's testimony at trial. We note that in May 2005, with Swaffard's

permission, Detective Lang began recording Swaffard's phone calls with Myers. Some of these recordings were of telephone calls Myers made to Swaffard from jail, in which Myers told Swaffard that he had been interviewed concerning Behrman's death and denied any involvement or knowledge thereof. At the PCR hearing, Patrick Baker testified that he had heard the recorded phone calls, but his strategy with respect to Swaffard was to get her off the witness stand as quickly as possible. He testified that Swaffard gave very damaging evidence, that her demeanor and presentation were credible, and that it was extremely challenging to explain to the jury why a grandmother would falsely implicate her grandson in a murder.

[48] On appeal, Myers argues that this was not a reasonable trial strategy, and that trial counsel were required to make a greater effort to impeach Swaffard precisely because her testimony was damaging and appeared credible. This is the sort of second-guessing of trial strategy in which we will not engage on appeal. "It is well settled that the nature and extent of cross-examination is a matter of strategy delegated to trial counsel." *Waldon v. State*, 684 N.E.2d 206, 208 (Ind. Ct. App. 1997), *trans. denied*. Myers has not established that a strategy of limiting the jury's exposure to Swaffard's testimony and denying her the opportunity to elaborate further thereon fell outside the wide range of constitutionally competent assistance.

[49] In any event, Myers has not directed our attention to any particularly persuasive impeachment evidence contained within the telephone recordings. Although Myers denied any involvement in or knowledge of what happened to

Berhman in the phone calls he made to Swaffard from the jail, he did so after being made aware that he was a suspect in the case. Additionally, he acknowledged during the conversations that he knew that telephone calls made from the jail are recorded. In light of these facts, Myers's denials of involvement were unlikely to sway the jury, and they do nothing to explain why Swaffard would falsely implicate Myers. Moreover, in order to impeach Swaffard with the recordings, trial counsel would have had to make the jury aware that Myers's own grandmother had voluntarily agreed to allow Detective Lang to record her conversations with Myers. The damaging effect of such evidence would likely outweigh its minimal impeachment value.

[50] Myers also argues that counsel was ineffective for failing to object to what he calls "religious vouching" for Swaffard's credibility. *Appellant's Brief* at 43. Specifically, Swaffard was allowed to testify, albeit briefly and without great detail, concerning her religious involvement, including her affiliation with a specific church, her studies at a Bible college, and religious writings she has authored. According, to Myers, this testimony "served no purpose other than to portray [Swaffard] as a God-fearing woman who wouldn't lie." *Id.* at 43. Myers argues that the error was compounded when the State made reference to Swaffard's faith in its closing argument, stating that she came forward after "great prayer and . . . thought" and that "by the grace of God she came forward and told you the truth[.]" *Trial Transcript* at 1247, 2827.

[51] At trial, Myers's counsel objected to the State's line of questioning regarding Swaffard's religious involvement on the basis of relevance. The trial court

overruled the objection and explained that it would allow "some introductory questions just so the jury knows who the witness is." *Id.* at 1813. On appeal, Myers argues that trial counsel's objection was insufficient because "he did not provide a specific rule." *Appellant's Brief* at 43. We note, however, that Myers has also failed to cite any specific rule of evidence in his appellant's brief in support of this assertion that Swaffard's testimony amounted to impermissible "religious vouching." Instead, he argues that "[v]ouching testimony invades the province of the jury", and he cites two cases, both of which address issues concerning adult witnesses vouching for the truthfulness of victims in child molesting cases. *Id.* The State, however, has directed our attention to Indiana Evidence Rule 610, which provides that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility."

[52] The testimony Myers argues amounted to impermissible religious vouching was part of general background information Swaffard was asked to give about her life. She testified that she had lived in her home for forty-five years, that she was homemaker, that her husband was deceased, and that her hobbies included reading, writing, and gardening. She testified further that she had completed some studies at a Bible college and authored a children's Bible school curriculum. The State then asked Swaffard whether she attended a specific church, and trial counsel objected to the line of questioning based on relevance. The trial court overruled the objection, and Swaffard went on to testify that she had attended Maple Grove Christian Church for nine years, that she wrote

poetry and ladies' devotionals, and she gave more background about her children and family.

[53] We cannot conclude that Swaffard's testimony concerning her religious involvement constitutes vouching, religious or otherwise. Although the relevance of Swaffard's religious involvement is certainly questionable (hence trial counsel's objection on that basis), her testimony contained no express or implied assertion that she was more or less likely to tell the truth due to her religious beliefs. Thus, Myers has not established a reasonable probability that an objection on this basis would have been sustained. *See Passwater v. State*, 989 N.E.2d 766 (Ind. 2013) (explaining that to prevail on a claim of ineffectiveness based on failure to object, the defendant must establish a reasonable probability that the objection would have been sustained). Moreover, Myers has not established that he was prejudiced by Swaffard's testimony in this regard. Swaffard's testimony concerning her involvement in church and religious activities was short and not greatly detailed. More importantly, Swaffard testified that Myers was her grandson and that she loved him and had been close with him since he was a small child. In light of the evidence concerning Swaffard's relationship with Myers and the absence of any motive to lie, we are unconvinced that testimony concerning her religious involvement had a significant impact on the jury's assessment of her credibility.

[54] To the extent Myers argues that the prosecuting attorney's remarks in closing argument crossed the line into impermissible religious vouching, we note that the State's references to Swaffard's religion were brief and vague at best. The

State's use of the common phrase "by the grace of God" conveyed nothing about Swaffard's religious beliefs, nor did its statement that Swaffard was "the last of a dying breed. A generation of people where truth mattered more than anything else, where telling the truth was an oath that was taken seriously." *Trial Transcript* at 2827, 2754-55. If anything, these statements suggested that Swaffard was more likely to tell the truth because of her age, not because her religious convictions compelled her to do so.

[55] The State's remark that Swaffard came forward "with great prayer" is arguably a more direct reference to her religion, but when viewed in context, it is apparent that the statement did not imply that Swaffard was credible because of her religious beliefs. *Id.* at 2747. The statement was made as part of the following argument:

> And stop for a moment to think how much doubt . . . how much reasonable doubt [Swaffard] had overcome before she came forward with what she knew. She knew what it would do to the family. You saw what Jodie, Sam, and Luke did. They circled the wagons. But she told you one thing, [Swaffard] did, didn't she? That her conscience wouldn't let her sleep unless she came forward. Think how hard it would be for any grandmother to do. You know, as you get older you start thinking about your family legacy. You start thinking about what's important in life and with . . . with many tears and with great . . . with great prayer and . . . and thought, [Swaffard] did come forward. This is a case about relationships.

*Id.* Thus, it is apparent that the State was arguing that it was very difficult for Swaffard to come forward due to the impact her cooperation with the investigation would have on her familial relationships, but that her conscience

nevertheless compelled her to do so. In other words, the State argued that Swaffard was credible because she came forward with reservations and at great personal expense. The brief reference to prayer did nothing to imply that Swaffard was more credible because of her religious beliefs.

[56] Moreover, Myers did not question trial counsel at the PCR hearing with respect to his failure to object to these statements. Our Supreme Court has held that, because counsel is presumed to be competent, "an action or omission that is within the range of reasonable attorney behavior can only support a claim of ineffective assistance if that presumption is overcome by specific evidence as to the performance of the particular lawyer." *Morgan v. State*, 755 N.E.2d 1070, 1074 (Ind. 2001). Under the circumstances presented here, trial counsel could have concluded that objecting to the State's vague, passing references to Swaffard's religious convictions would only draw more attention to them, and Myers has presented no evidence to the contrary. *See Smith v. State*, 822 N.E.2d 193 (Ind. Ct. App. 2005) (noting that it is reasonable strategy for counsel not to object to certain evidence to avoid drawing unfavorable attention to it). In any event, we are unconvinced that the complained-of statements had an impact on the jury's verdict. For these reasons, Myers has established neither deficient performance nor prejudice stemming from counsel's failure to object to so-called religious vouching.

F.

[57] Myers next argues that trial counsel were ineffective for failing to adequately impeach Carly Goodman's testimony. Goodman testified that one night in March 2000, Myers, her then-boyfriend, took her for a long car ride through Gosport to a wooded area, where he parked in a "clearance" surrounded by a wooded area. *Trial Transcript* at 1899. Goodman testified that after Myers stopped the car, the couple argued and that she was afraid and wanted to go home. Goodman testified further that in February of 2006, she went for a drive with Detective Lang to identify places that Myers had taken her during their relationship. She recognized one place as the wooded area where she and Myers had argued in March 2000. This was the same area where Behrman's remains were discovered in 2003. Myers's trial counsel conducted a relatively short cross-examination, in which he asked a number of questions designed to create doubt as to the whether the site was sufficiently distinctive-looking for Goodman to reliably differentiate it from other nearby wooded areas. On appeal, Myers argues that trial counsel should have impeached Goodman with her prior, allegedly inconsistent statements about the site.

[58] At the PCR hearing, Patrick Baker testified that his strategy with respect to Goodman's cross-examination was similar to his strategy with Swaffard—he sought to get Goodman off the witness stand as quickly as possible. He testified further that Goodman "had a lot of information, 404(b) evidence, that regarded domestic battery situations with [Myers]. Regarded her being held against her will in a trailer, I think, for three or four days without any clothes. I think protective orders that she had filed against [Myers.]" *PCR Transcript* at 581. He

explained that this information had been ruled inadmissible, but he still had concerns about Goodman bringing it up. Moreover, when asked whether he had planned to impeach Goodman with prior inconsistent statements, counsel responded that he did not recall specifically, but that any strategies he had devised changed during Goodman's testimony because she displayed a palpable demeanor of fear toward Myers.

[59] Myers dismisses trial counsel's explanation of his strategy as unreasonable. He asserts that counsel could have cross-examined Goodman concerning her prior statements made to Detective Lang at the time she identified the site without eliciting or opening the door to prejudicial and inadmissible testimony. Further, Myers argues that fearful witnesses are "a reality of criminal defense for which counsel should be prepared."[7] *Appellant's Brief* at 45. We will not engage in this sort of second-guessing of trial counsel's strategic decisions concerning the nature and scope of cross-examination. Myers has not established that his trial counsel's strategy was unreasonable; to the contrary, it was quite reasonable for trial counsel to minimize the jury's exposure to Goodman's fearful demeanor and avoid any inadvertent mention of highly prejudicial and inadmissible evidence by limiting the scope and duration of his cross-examination, while simultaneously eliciting testimony casting doubt on the reliability of her identification of the area.

---

[7] Myers does not, however, make any attempt to explain what such "preparation" would entail or propose an alternative strategy for dealing with such witnesses. It appears to us that one obvious strategy could be to limit cross-examination of such witnesses, as trial counsel did in this case.

[60] Moreover, Myers has again failed to establish the requisite prejudice. Much of the impeachment evidence Myers argues should have been used during Goodman's cross-examination was explored through Detective Lang's testimony. For example, Myers argues that trial counsel should have impeached Goodman with Detective Lang's testimony during the grand jury proceedings that Goodman recognized the area due to a humming sound the tires made as they drove across a metal bridge. The bridge, however, was not installed until 2001, well after Goodman's March 2000 car ride with Myers.

[61] Contrary to Myers's assertion on appeal, Detective Lang's grand jury testimony did not establish that Goodman recognized the area due to the sound of the tires on the bridge. Although Detective Lang mentioned the humming sound the tires made, he did not state that the sound is what triggered Goodman's memory. Instead, Detective Lang described the bridge and the humming sound, and said it was at that point that Goodman stopped him midsentence and said that that the area looked more familiar to her than any of the other places they had been. Detective Lang later clarified that Goodman "did not indicate on the bridge. That's just where she interrupted my sentence and said, this place looks more familiar. She didn't say the bridge was more familiar, I remember that sound. She just said this place looks more familiar than any place we've been up to that point." *Grand Jury Transcript* at 6104. Indeed, in her own grand jury testimony, Goodman specifically stated that it was not the bridge that caused the area to be recognizable to her. Instead, she stated that she recognized a nearby creek, woods, steep hills with rocks on them, and an

area she described as a "cutoff", which was not a road but provided enough clearance to allow a person to drive a short distance into the woods. *Id.* at 4080.

[62] Moreover, trial counsel did, in fact, raise the issue of Goodman's recognition of the bridge with Detective Lang. Specifically, trial counsel elicited testimony from Detective Lang concerning the date the bridge was constructed, and he asked Detective Lang whether it was true that Goodman recognized the bridge. Detective Lang responded that Goodman did not recognize the bridge, and instead recognized the area. Detective Lang's trial testimony is supported by both his and Goodman's grand jury testimony. For these reasons, it is apparent that any further attempt to impeach Goodman or Lang using their grand jury testimony on this point would have been unsuccessful.[8]

[63] Myers also makes much of the fact that Goodman told Detective Lang that the wooded area where Behrman's remains were found was similar to, or looked like, the place Myers took her in March 2000 instead of positively identifying the area. At trial, however, when shown a picture of the area in which Behrman's remains were discovered, she responded "[t]hat's where he took

---

[8] Myers also argues that trial should have used Detective Lang's report to impeach his testimony that Goodman recognized a clearing in the woods. According to Myers, "[Detective] Lang did not document Goodman's recognition of a cut-away in his report prepared contemporaneous with the trip." *Appellant's Brief* at 11. Myers has not, however, directed our attention to a copy of Detective Lang's report appearing in the record. We will not scour the extremely voluminous record in this case in search of support for Myers's contentions on appeal. Because Myers has not adequately supported this claim with citation to the record, it is waived. *See Smith v. State*, 822 N.E.2d 193 (Ind. Ct. App. 2005). Waiver notwithstanding, at trial, Detective Lang and Goodman both testified that Goodman recognized the clearing in the woods. It is unlikely that the possibility that Detective Lang omitted this fact in his report would have significantly undermined their testimonies in this regard.

me." *Trial Transcript* at 1900.  Our review of transcript reveals that trial counsel did a more than adequate job of calling into question the reliability of Goodman's identification of the area.  On cross-examination, trial counsel elicited the following testimony:

> Q. . . . How do you differentiate that picture from any other picture that'd be taken in the woods?
> A. Because of the way the clearance is.
> Q. How do you rec . . . differentiate that clearance from any other clearance?
> A. It's . . . it's just what looks familiar to me.
> Q. But you don't know . . . that could be anywhere, correct?
> A. Yes.

*Id.* at 1906.  Moreover, Detective Lang testified that Goodman told him that the area "look[ed] more familiar to [her] that anyplace we've been." *Id.* at 2413. Because the jury was presented with testimony that Goodman told Detective Lang that the area looked familiar instead of positively identifying the area, as well as with Goodman's own testimony that the area just "look[ed] familiar", *id.*, counsel did not perform deficiently by failing to use Detective Lang's grand jury testimony to establish those facts.

[64]    Myers also argues that his trial counsel were ineffective for failing to object to Goodman's description of Myers's behavior during the March 2000 car trip, which he calls "prejudicial 404(b) testimony". *Appellant's Brief* at 46.  Myers does not, however, cite the applicable language of Indiana Evidence Rule 404(b) or make any attempt to apply it.  Accordingly, this argument is waived for lack of cogency. *See Davis v. State*, 835 N.E.2d 1102, 1113 (Ind. Ct. App.

2005) (explaining that "[a] party waives an issue where the party fails to develop a cogent argument or provide adequate citation to authority and portions of the record"), *trans. denied.*

[65] To the extent Myers has made a coherent argument on this point, it essentially boils down to an assertion that, in light of other testimony suggesting that Behrman may have been raped, Goodman's testimony left the jury with the impression that Myers had raped her during the March 2000 car trip. In support of this argument, Myers directs our attention to Goodman's testimony that during the trip, she did not kiss Myers, she wanted to go home, and that she was afraid, as well as her testimony that Myers refused to take her home, and that they both got out of the car and stayed at the location for thirty to forty-five minutes before Myers finally took her home. Myers's argument on this point is unconvincing. Goodman told the jury what happened once they reached the clearing in the woods—she and Myers argued and Myers refused to take her home, which scared her. Nothing about Goodman's testimony implied that she had been raped.

[66] In any event, it is apparent that the testimony was admitted to show that Myers was familiar with the area in which Behrman's remains were discovered and to explain why Goodman was still able to remember the location so vividly several years later, and not to establish that Myers had a propensity to commit murder or any other crime. Thus, the testimony did not violate Evidence Rule 404(b), and Myers points to no danger of unfair prejudice aside from his unpersuasive argument that the testimony left the jury with the impression that Goodman

had been raped. *See Embry v. State*, 923 N.E.2d 1, 9 (Ind. Ct. App. 2010) (explaining that "[i]n assessing the admissibility of 404(b) evidence a trial court must (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403"), *trans. denied*. Thus, Myers has not established a reasonable probability that an objection on the basis of Evidence Rule 404(b) would have been sustained, and he is consequently unable to show that counsel performed deficiently by failing to object on that basis.

## G.

[67] Next, Myers argues that trial counsel were ineffective for failing to object to testimony suggesting that Behrman had been raped. Specifically, forensic pathologist Dr. Stephen Radentz testified that the condition in which Berhman's remains were discovered was consistent with a classic rape-homicide scenario. Additionally, Dr. Radentz responded affirmatively to a jury question asking whether he believed Berhman had been raped. During follow-up cross-examination by Myers's trial counsel, Dr. Radentz admitted that there was no physical evidence that a rape had occurred. When questioned further by the State, Dr. Radentz testified that, based on his training and experience, he nevertheless believed that Berhman had been raped because the location and condition of the remains were consistent with a rape-homicide. The State referenced Dr. Radentz's rape testimony in closing arguments.

On direct appeal, Myers argued that Dr. Radentz's references to rape amounted to fundamental error. Another panel of this court concluded that the admission of Dr. Radentz's rape testimony violated Evidence Rule 403 because Myers was not charged with rape and there was no physical evidence to support the rape determination. *Myers v. State*, 887 N.E.2d 170. The court went on, however, to conclude that the admission of the evidence did not amount to fundamental error. *Id.* The court reasoned as follows:

> We conclude that any error in the admission of Dr. Radentz's rape testimony did not substantially influence the outcome of the trial. The question of rape was peripheral to the murder charge and received relatively minimal attention at trial. To the extent the possibility of rape was at issue, defense counsel thoroughly cross-examined Dr. Radentz, eliciting his testimony that there was no physical evidence that Behrman had been raped and that the only basis upon which he opined that a rape had occurred was his training and experience with respect to circumstances surrounding the general disposal of human remains. Furthermore, the trial court excluded all evidence tending to link Myers to inappropriate sexual conduct. The references to rape, therefore, did nothing to implicate Myers as the perpetrator of this charged crime, which was the central issue at trial.

*Id.* at 187.

Myers is correct that this court's conclusion on direct appeal that the admission of Dr. Radentz's rape testimony did not amount to fundamental error does not necessarily preclude a finding that counsel's failure to object thereto amounted to ineffective assistance. *See Benefield v. State*, 945 N.E.2d 791 (Ind. Ct. App. 2011). To establish fundamental error, a defendant must show that the alleged error was so prejudicial as to make a fair trial impossible. *Ryan v. State*, 9

N.E.3d 663 (Ind. 2014). To satisfy the prejudice element of an ineffective assistance of counsel claim, on the other hand, a defendant must establish that there is a reasonable probability that the result of the proceeding would have been different but for counsel's unprofessional errors. *Massey v. State*, 955 N.E.2d 247 (Ind. Ct. App. 2011). Thus, this court has noted "that there is a subtle distinction between the fundamental error and ineffective assistance prejudice standards." *Benefield v. State*, 945 N.E.2d at 803. Although the fundamental error standard "presents a higher bar", "the two standards may frequently lead to the same result". *Id.* at 804, 803.

[70] This is one such case. For the same reasons this court on direct appeal concluded no fundamental error occurred, we also conclude that Myers has not established prejudice sufficient to warrant a finding of ineffective assistance of counsel. We agree with the panel's conclusion that Dr. Radentz's rape testimony did not substantially influence the outcome of the trial. Accordingly, Myers has not established a reasonable probability that the outcome of the trial would have been different but for counsel's failure to object.

H.

[71] Next, Myers argues that his trial counsel was ineffective for failing to object to what he calls irrelevant and highly prejudicial gun evidence. Specifically, Myers points to the testimony of Billy Dodd, Myers's neighbor at the time of Behrman's disappearance, that a number of rifles and shotguns were kept in a barn near Myers's trailer. Additionally, Debbie Bell, Myers's aunt, testified that

Myers sold her husband a shotgun at Myers's father's funeral in December 2000, several months after Behrman's disappearance. Detective Lang testified that he retrieved that gun from Bell. Although the record reveals that this gun, as well as several others that Myers sold or distributed to relatives, had been stolen from the barn near Myers's trailer, the jury was not made aware of that fact and evidence of Myers's resulting conviction for receiving stolen property was excluded.

[72] "Evidence that the defendant had access to a weapon of the type used in the crime is relevant to a matter at issue other than the defendant's propensity to commit the charged act." *Rogers v. State*, 897 N.E.2d 955, 960 (Ind. Ct. App. 2008), *trans. denied*. On the other hand, "[e]vidence of weapons possessed by a defendant but not used in the crime for which the defendant is charged should generally not be introduced because the evidence is irrelevant and highly prejudicial." *Oldham v. State*, 779 N.E.2d 1162, 1174 (Ind. Ct. App. 2002). On appeal, Myers argues that trial counsel should have objected to all evidence relating to the guns from the barn on the basis of relevance because Detective Lang's grand jury testimony established that they were not stolen until November 2000, well after Behrman's disappearance, and therefore could not have been the murder weapon.[9] But Detective Lang's testimony was hardly

---

[9] Citing the same portion of the grand jury transcript, Myers also claims that the State acknowledged during the grand jury proceedings that the murder weapon was not among the guns taken from the barn. The transcript contains no such concession, and even if it did, Myers has not directed our attention to any authority or made any argument remotely supporting the proposition that the State would be somehow bound by a statement it made in the midst of an ongoing grand jury investigation.

conclusive on this point.  Detective Lang testified as follows before the grand jury:

> I talked to Mr. Maher, [the owner of the barn], the burglary he reported it November 2000, which would have been after the death obviously of [Behrman].  I asked him if it could be possible that he would not have known between May and November when he reported it that any of those weapons were missing?  In his opinion, he said no.  I don't know.  You know I mean he . . . if they were all missing, I'm sure he's correct.  If he took one, you know, it could have been out and he would not [have] noticed it in my opinion.  But, he said that the air conditioner was removed and that was what tipped him off that something was wrong and then he found the guns were gone, so.  He stated that he made trips to the barn on several occasions enough between May and November that he would have known somewhere in between that time that they would have been gone.

*Grand Jury Transcript* at 5483-84.

[73]  The post-conviction court found testimony concerning the guns relevant because they (or at least one of them) could have been taken during a previous, undiscovered entry.  We agree.  Unlike in *Oldham v. State*, here there was no conclusive scientific proof that the weapons at issue were not used in the crime.  The fact that the owner of the barn believed that he would have noticed if the guns were stolen prior to Behrman's death goes to the weight to be attributed to the evidence, not its admissibility.[10]  Thus, Myers has not established that the gun testimony was irrelevant.

---

[10] The owner of the barn did not testify at the PCR hearing.

Myers has also failed to establish prejudice arising from the admission of the gun evidence in this case. There was other evidence presented at trial to establish that Myers had access to shotguns like the one used to kill Behrman. Samuel Myers, Myers's brother, testified that he owned a twelve-gauge shotgun, which he kept at his parents' house. Samuel testified further that he noticed that his shotgun was missing around August of 2000 and that he was never able to locate the weapon. Myers's other brother, Lucas Myers, also testified that Myers had access to shotguns at their parents' house, and Richard Swinney, Myers's cousin by marriage, testified that Myers told him that he hunted with a twelve-gauge shotgun. Accordingly, additional evidence to the effect that Myers had access to and possession of such weapons was unlikely to have had a significant impact on the outcome of the trial. Moreover, evidence was presented that many people in the community possessed similar weapons for hunting purposes and that Myers was himself a hunter. Thus, Myers's possession of such weapons, standing alone, was unlikely to be viewed by the jury as indicative of dangerousness or criminal activity. For all of these reasons, Myers has not established that his trial counsel were ineffective for failing to object to testimony that guns were stored in a barn near Myers's trailer and that Myers sold a shotgun to his uncle.

I.

Myers next argues that trial counsel were ineffective for failing to object to the testimony of jailhouse informant John Roell. As we have already noted, "in order to prevail on a claim of ineffective assistance due to the failure to object,

the defendant must show a reasonable probability that the objection would have been sustained if made." *Passwater v. State*, 989 N.E.2d at 773. Myers has not satisfied this burden.

[76] Roell testified at trial that he had been Myers's cellmate in the Monroe County Jail in May 2005. He testified further that Myers told him he was waiting to be questioned by the Indiana State Police concerning Behrman's bicycle. According to Roell, Myers appeared nervous and angry, and at one point stated "if she wouldn't have said anything, none of this probably would have happened." *Trial Transcript* at 2270-71. Roell understood Myers to be referring to Behrman when he made this statement, and Roell testified further that Myers referred to Behrman as a bitch.

[77] Myers contends that counsel should have objected to Roell's testimony pursuant to Indiana Evidence Rule 403. This rule provides, in pertinent part, that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" Ind. Evid. R. 403. "All evidence that is relevant to a criminal prosecution is inherently prejudicial; thus proper inquiry under Evidence Rule 403 boils down to a balance of the probative value of the proffered evidence against the likely unfair prejudicial impact of that evidence." *Fuentes v. State*, 10 N.E.3d 68, 73 (Ind. Ct. App. 2014), *trans. denied*. "When determining the likely unfair prejudicial impact, courts will look for the dangers that the jury will (1) substantially overestimate the value of the evidence or (2) that the evidence will arouse or inflame the passions or sympathies of the jury." *Duvall v. State*, 978 N.E.2d 417, 428 (Ind.

Ct. App. 2012) (quoting *Carter v. State*, 766 N.E.2d 377, 382 (Ind. 2002)), *trans. denied*.

[78] The crux of Myers's argument is that the probative value of Roell's testimony was low because he was not a credible witness due to inconsistencies among his initial statement to police, his deposition testimony, and his trial testimony. But it was for the trier of fact, not the trial court, to judge Roell's credibility. Ultimately, Myers's argument in this regard goes to the weight to be afforded to Roell's testimony, not its admissibility. *See Embrey v. State*, 989 N.E.2d 1260, 1268 (Ind. Ct. App. 2013) ("[i]nconsistencies in witness testimony go to the weight and credibility of the testimony, the resolution of which is within the province of the trier of fact" (internal quotation omitted)). Roell's testimony, if credited by the trier of fact, was highly probative of Myers's guilt.

[79] Myers also argues that the admission of Roell's testimony posed a significant danger of unfair prejudice because, in order to fully impeach Roell, Myers would have had to use Roell's prior statement to police, which contained information more damaging to Myers's defense than Roell's trial testimony.[11] "Unfair prejudice addresses the way in which the jury is expected to respond to the evidence; it looks to the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence to suggest decision on an improper

---

[11] In support of this assertion, Myers cites only the deposition of Detective Cody Forston of the Bloomington Police Department. In the deposition, Detective Forston recounted Roell's statement to him, noting specifically that Roell told him that Myers had stated that Behrman had been sexually assaulted and that "if the dumb bitch would have done what [he] had told her, she wouldn't be dead now." *PCR Exhibit* 239, p. 14. Roell did not make these statements in his deposition or trial testimony.

basis...." *Ingram v. State*, 715 N.E.2d 405, 407 (Ind. 1999) (internal quotation marks omitted).

[80] Nothing in Roell's testimony was likely to prompt the jury to convict Myers on an improper basis. Myers has cited no relevant authority supporting the proposition that evidence may be considered unfairly prejudicial because it forces counsel make difficult strategic decisions with respect to its impeachment. We decline to develop this argument on his behalf. Because Myers has not satisfied his burden of establishing that an objection to Roell's testimony on the basis of Evidence Rule 403 would have been sustained, he has consequently failed to establish deficient performance and resulting prejudice.

J.

[81] Next, Myers argues that his trial counsel were ineffective for failing to present all available evidence tending to establish the guilt of Owings, Sowders-Evans, and Clouse, and for failing to investigate and discover additional evidence to that effect. This argument is nothing more than a request to substitute Myers's PCR counsel's strategic judgment, informed by hindsight, for that of Myers's trial counsel, which we will not do.

[82] In 2002, Owings confessed to the police that she, Sowders-Evans, and Clouse had killed Behrman. In the story Owings gave police, she and Sowders-Evans were riding around with Clouse in his pickup truck and using drugs when Clouse struck a girl riding a bike on Harrell Road. Clouse stopped and loaded the injured and incapacitated girl into the back of the truck and wrapped her in

plastic secured with bungee cords before placing the bicycle on top of her. Owings went on to state that Clouse then drove them all to Salt Creek, where the three of them took turns stabbing the girl in the chest before Clouse and Sowders-Evans pushed the body into the water. Neither Sowders-Evans nor Clouse ever confessed to the police, and Owings recanted her confession after Behrman's remains were discovered in Morgan County.

[83]     The State called Owings as a witness at Myers's trial. Owings testified that when she was questioned by Detective Lang in April 2003, she denied any knowledge of Behrman's disappearance. She testified further that she had previously lied about her involvement because she was facing a potential eighty-six-year sentence for various unrelated felonies, and her attorney had urged her to come forward with anything she knew about the case in an attempt to curry favor with the prosecution. Owings testified that she had named Clouse and Sowders-Evans because "[f]rom the very first time I was questioned, those were the two names that I was supposedly to be with [sic] or around at the time of the said incident. They thought that all three of us were together." *Trial Transcript* at 2094. She also testified that parts of her testimony were based on places she had been with Sowders-Evans in the past. Owings testified further that she had told police that the body was wrapped in plastic to explain why she was unable to identify the type of clothing Behrman had been wearing and that she said they had disposed of the body in Salt Creek "[b]ecause there's so much stuff in there . . . I figured . . .they couldn't even dive in it . . . . I knew they wouldn't find her[.]" *Id.* at 2098. Owings stated that she recanted her

confession after Behrman's remains were discovered because she believed that scientific evidence would exclude her.

[84] Additionally, the State introduced into evidence a letter Owings received from her attorney prior to her confession. In the letter, Owings's attorney painted an exceptionally dire picture of Owings's prospects. Specifically, he wrote that "we might be talking about you being locked up until just about everyone you know has died of old age." *PCR Exhibit* 301. Her attorney went on to write that he had heard that Owings might know something about the Behrman case, and told her "[f]or the sake of your children, your family, and your own life, if there is anything you can tell these people the time is NOW." *Id.* He added that he had gotten "the distinct impression you might not be punished for anything to do with the Behrman case, and might get considerably better treatment in these other matters, if you can help solve this." *Id.* He also wrote that Sowders-Evans, who was apparently also incarcerated, was trying to get out of jail, and that if Sowders-Evans talked first, Owings would be "sunk." *Id.*

[85] Myers argues that trial counsel were ineffective for failing to present certain testimony and witnesses supporting the theory that Owings, Sowders-Evans, and Clouse murdered Behrman. Trial counsel Hugh Baker, however, testified that the defense team made a strategic decision not to pursue Owings's confession as its primary theory of defense. Specifically, he testified as follows:

> . . . [W]e felt that trying to present to a jury and convince a jury what the Federal Bureau of Investigations, the Bloomington Police Department, and the Indiana State Police had concluded was false was not a good strategy, that is the Owings' confession. She'd recanted

this confession. And they hadn't found Jill Behrman in the . . . in Salt Creek. Rather, she was found . . . her remains were found in Morgan County and she . . . hadn't died from drowning but she'd died from 99.9 percent certainty of being shot.

*PCR Transcript* at 840. For these reasons, a decision not to pursue the Owings theory would clearly reflect a reasonable strategic judgment. Myers, however, asserts that trial counsel did, in fact, pursue the Owings theory at trial, and it was therefore deficient performance not to present more evidence to support it.

[86] The record reveals that trial counsel pursued the Owings theory to some extent. Hugh Baker elicited testimony from Owings on cross-examination that she had discussed Behrman's disappearance with several acquaintances and made incriminating statements to at least one of them. He also elicited testimony from Owings concerning the substance of her confession to police, and the fact that she had first been interviewed in connection with the Behrman case in June of 2000. Trial counsel also touched on the Owings theory with other witnesses throughout trial. Trial counsel elicited testimony from Dr. Radentz that not all of Behrman's bones were recovered, and that it was possible (though unlikely) for her to have been stabbed without leaving marks on her skeletal remains. Trial counsel also elicited testimony from Detective Lang and FBI Agent Gary Dunn that the FBI had drained part of Salt Creek looking for Behrman's remains, a task which took several weeks. A search of the drained creek yielded a retractable knife, a bungee cord, and two pieces of plastic sheeting, which were consistent with items Owings mentioned in her confession. Trial counsel also elicited testimony from Agent Dunn that he had received a tip that the

body had been moved and presented evidence that Papakhian had reported seeing Behrman on Harrell Road on the morning of her disappearance. In closing arguments, Patrick Baker told the jury that there were two theories leading away from Myers's guilt and toward that of others—the Owings theory and the Hollars theory.

[87] Essentially, Myers argues that trial counsel was obligated to take an all-or-nothing approach to the Owings theory—either forego it entirely or present all evidence supporting it. We are unpersuaded by this argument. It is noteworthy that it was the State who first informed the jury of Owings and her recanted confession in its opening statement. The State did so in an effort to explain the delay in Myers's development as the primary suspect, and presumably to get ahead of any attempt by the defense to cast suspicion on Owings and her alleged accomplices. Likewise, it was the State who called Owings to testify at trial. Under these circumstances, trial counsel did not act unreasonably by making a strategic decision to attempt to present just enough evidence to keep the possibility of Owings's involvement alive in the minds of the jurors, without making the Owings theory the crux of Myers's defense. Indeed, it appears to us that trial counsel's decision to pursue the Owings theory to only a limited extent was actually quite shrewd because it prevented the jury from being exposed to all of the many conflicting versions of the story Owings, Sowders-Evans, and Clouse allegedly told.[12] This information might have resulted not only in the

---

[12] Versions of the story were told in which Behrman was struck by a pickup truck, a car, and an SUV. Clouse allegedly told a cellmate that Behrman's body was wrapped in black plastic, while Owings had told the police the plastic was off-white. Some versions of the story varied wildly from Owings's confession to police. For

elimination in the jurors' minds of the possibility that Owings's confession was true, but also in trial counsel's loss of credibility with the jury. As the State argues in its brief, "the best counsel could hope for was to keep Owings on the delicate, razor-thin edge of jurors' credibility assessments. That strategy would have been ruined if counsel had pursued the over-zealous course of action advocated by Myers in this proceeding." *Appellee's Brief* at 50. Accordingly, Myers has not established that trial counsel performed deficiently in this regard.[13]

[88] We also conclude that Myers was not prejudiced by trial counsel's decision not to present additional evidence supporting the Owings theory. Myers makes no argument that counsel failed to present any physical evidence—rather, he claims that counsel should have presented testimony concerning incriminating statements Owings, Clouse, and Sowders-Evans made to others, as well as testimony corroborating parts of Owings's confession and evidence that Sowders-Evans fled the state during the investigation.[14] But the jury was aware

---

example, both Owings and Sowders-Evans allegedly told others that Behrman's body had been dismembered, and more than one version of the story was told in which Behrman was kept in the trunk of a car for days before being killed. Additionally, Sowders-Evans and Owings both allegedly told stories of killing Behrman that involved a completely different cast of characters than that featured in Owings's confession to the police. Owings allegedly gave one account of Behrman's abduction and murder that included a brutal rape.

[13] To the extent Myers argues that trial counsel failed to investigate and discover additional evidence supporting the Owings theory, we conclude that the limitations on the investigation were the result of trial counsel's reasonable strategic decision to limit reliance on the Owings theory. *See Strickland v. Washington*, 466 U.S. 668.

[14] Myers also argues that trial counsel should have presented evidence that Owings, Clouse, and Sowders-Evans gave false or shaky alibis. We note that Myers has not directed our attention to any evidence that Sowders-Evans ever provided an alibi. Moreover, Myers has not directed our attention to any portion of the record indicating that the jury was presented with evidence that any of the three had ever provided an alibi. Thus, there was no need for counsel to impeach those alleged alibis.

of the most powerful evidence against Owings—her own confession to police. The jury was also aware that prior to the discovery of Behrman's remains, police put enough stock into Owings's confession to go to the extreme effort of draining part of Salt Creek, and that some corroborating physical evidence was discovered as a result. Additionally, trial counsel presented evidence that Papakhian had seen Behrman on Harrell Road on the date of her disappearance. Moreover, much of the testimony Myers argues trial counsel should have introduced might have been inadmissible,[15] and much of the evidence Myers argues corroborated Owings's confession was shaky and could easily be explained away by Owings's testimony that she based parts of her confession on things that had actually happened.[16]

[89]   In any event, even if trial counsel had presented a parade of credible witnesses to testify that Owings, Clouse, and/or Sowders-Evans had confessed to hitting Behrman with a car, wrapping her in plastic, stabbing her in the chest, and dumping her body in Salt Creek, the fact remains that the confession simply did

---

[15] There are obvious hearsay problems with much of this evidence. Myers has made no attempt to establish that the statements at issue fall within an established exception to the hearsay rule, and we decline to develop this argument on his behalf.

[16] In her confession, Owings stated that the night before Behrman's abduction, she and Sowders-Evans walked to a house at the corner of Rockport and That Road and asked to use the telephone. Alice O'Mullane lives at that corner, and she provided an affidavit stating that she remembered two girls coming to her home after midnight and asking to use the phone "[s]ome time in 2002". *PCR Exhibit* 134. Owings also testified that Clouse ran a Jeep off Lampkins Ridge Road while en route to Salt Creek after hitting Behrman with the truck. DL Poer testified at the PCR hearing that in 2000, she lived off of Lampkins Ridge Road and drove a Jeep. Poer recalled almost being run off the road by a red truck in May 2000, but she gave conflicting statements as to the precise date in May. Owings later told Detective Lang that she had made up this portion of the story because she was familiar with the road and knew that people are often run off the road there. Poer also testified that the stretch of road was very dangerous. Given these witnesses' uncertainty concerning the dates of these events, as well as Owings's testimony that she based parts of her story on things that actually happened, we cannot conclude that this evidence would have had a significant impact on the jury.

not mesh with the physical evidence. Behrman's remains were found in a remote, wooded area, not in Salt Creek. There was no evidence that Behrman had been stabbed or struck by a car, but there was clear evidence that she had been shot in the head with a shotgun at the location where her remains were discovered. Although trial counsel elicited testimony from Agent Dunn that he had received a tip that the body had been moved, evidence was presented that the visibility in Salt Creek was extremely poor, and even the FBI was forced to go to the extreme measure of draining the creek in order to search it. Convincing the jury that Owings, her alleged accomplices, or their associates could have managed to remove the body from the creek would have been challenging, to say the least. Given the numerous, obvious weaknesses of the Owings theory, we cannot conclude that the decision not to pursue the theory to the extent Myers now advocates resulted in prejudice to Myers. Consequently, his claim of ineffective assistance of counsel on this basis fails.

## K.

[90] Finally, Myers claims that the cumulative effect of trial counsel's errors amounted to ineffective assistance entitling him to a new trial. We have reviewed each of Myers's claims of error in detail and concluded that none of them amount to ineffective assistance of counsel. Indeed, most of Myers's claims of ineffective assistance are nothing more than quarrels with trial counsel's reasonable strategic decisions. "Alleged '[t]rial irregularities which standing alone do not amount to error do not gain the stature of reversible error when taken together.'" *Kubsch v. State*, 934 N.E.2d at 1154 (quoting *Reaves v.*

*State*, 586 N.E.2d 847, 858 (Ind. 1992)) (alteration in original).  Accordingly, we are unpersuaded by Myers's cumulative error argument.

2.

Next, Myers argues that the State violated his due process rights by failing to disclose all exculpatory evidence to the defense.  In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  In order to prevail on a *Brady* claim, the defendant must establish:  "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial."  *Stephenson v. State*, 864 N.E.2d 1022, 1056-57 (Ind. 2007) (quoting *Conner v. State*, 711 N.E.2d 1238, 1245-46 (Ind. 2000)).  Under *Brady*, evidence is considered material if the defendant establishes a reasonable probability that the result of the proceeding would have been different had the State disclosed the evidence.  *Stephenson v. State*, 864 N.E.2d 1022.  The State will not be found to have suppressed material information if such information was available to the defendant through the exercise of reasonable diligence.  *Id.*

Myers concedes that he cannot identify even one specific piece of evidence that the State suppressed.  Instead, he asserts that in the course of investigating Myers's post-conviction claims, post-conviction counsel received over 8,000

pages of documents directly from the FBI and the Bloomington Police Department, and the State did not document transferring any of these materials to the defense prior to trial in its discovery notices. At the PCR hearing, however, evidence was presented that trial counsel received additional discovery that was not documented by the State. Patrick Baker testified that discovery was "fluid" and that the State was not always meticulous in documenting what materials it had provided. *PCR Transcript* at 525. Chief Deputy Prosecutor Robert Cline stated that prior to trial, he provided trial counsel with a CD containing 3,000 pages of FBI reports, and possibly other kinds of reports, without documenting the transfer. Additionally, Patrick Baker testified that he reviewed boxes of investigative reports from the FBI, the Indiana State Police, the Bloomington Police Department, and the Indiana University Police Department at the Putnamville State Police Post.[17]

[93] We agree with the post-conviction court's conclusion that based on the evidence presented at the PCR hearing, it is unclear whether trial counsel was provided with or had access to all of the relevant investigative reports. Consequently, Myers has not satisfied his burden of establishing that the State suppressed such evidence. Moreover, even if we assume the State failed to disclose some evidence, without knowing what that evidence was, we cannot

---

[17] Myers makes much of the fact that Patrick Baker testified that he read these reports in the post's property room. Sergeant Christopher Lewis, an ISP crime scene investigator, testified that police reports are not kept in the property room. He testified further, however, that reports are kept at the Putnamville Post. Thus, while trial counsel might have been mistaken in stating that he read the reports in the property room, this in no way establishes that he did not view the reports at the Putnamville Post. Sergeant Lewis testified further that the systems used to track who has viewed physical evidence held in the property room do not track who has viewed police reports. Thus, the fact that trial counsel's viewing of the police reports was not documented in evidence logs likewise does not establish that he did not view the reports.

begin to determine whether it was favorable to the defense and material to an issue at trial, or merely cumulative of what was disclosed to Myers. Additionally, Myers has made no attempt whatsoever to establish that the allegedly suppressed investigative reports were not available to him through the exercise of reasonable diligence. Essentially, Myers asks us to ignore his evidentiary burden and presume not only that investigative reports were suppressed, but also that somewhere among the allegedly suppressed reports, a nugget of evidence satisfying the requirements of *Brady* must exist. This we will not do.

3.

[94] Finally, Myers argues that he is entitled to reversal of his conviction because the State committed prosecutorial misconduct at trial. Specifically, he asserts that the State committed prosecutorial misconduct by knowingly presenting false evidence and perjured testimony. *See Giglio v. United States*, 405 U.S. 150, 153 (1972) (explaining that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice'" (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

[95] Myers has fallen far short of establishing that the complained-of testimony and evidence were false or that the State knew as much. But Myers's claims of prosecutorial misconduct fail for a more fundamental reason. "Post-conviction procedures do not provide a petitioner with an opportunity to present freestanding claims that contend the original trial court committed error."

*Wrinkles v. State*, 749 N.E.2d 1179, 1187 n.3 (Ind. 2001). Rather, "'[i]n post-conviction proceedings, complaints that something went awry at trial are generally cognizable only when they show deprivation of the right to effective counsel or issues demonstrably unavailable at the time of trial or direct appeal.'" *Bunch v. State*, 778 N.E.2d 1285, 1289-90 (Ind. 2002) (quoting *Sanders v. State*, 765 N.E.2d 591, 592 (Ind. 2002)). "An available grounds for relief not raised at trial or on direct appeal is not available as a grounds for collateral attack." *Canaan v. State*, 683 N.E.2d 227, 235 (Ind. 1997). Myers has made no attempt to establish that his claims of prosecutorial misconduct were demonstrably unavailable at trial or on direct appeal. His claims of prosecutorial misconduct are freestanding claims of trial error, and as such are not cognizable in this PCR proceeding.

[96] Judgment affirmed.

Vaidik, C.J., and Robb, J., concur.