## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 14 2018, 11:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael C. Keating
Keating & LaPlante, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Derek Franklin Williams, *Appellant-Petitioner,* | May 14, 2018 |
| v. | Court of Appeals Case No. 14A04-1708-PC-1964 |
| | Appeal from the Daviess Superior Court |
| State of Indiana, *Appellee-Respondent* | The Honorable Dean A. Sobecki, Judge |
| | Trial Court Cause No. 14D01-1406-PC-611 |

**Baker, Judge.**

[1] Derek Franklin Williams appeals the denial of his petition for post-conviction relief. Williams argues that trial counsel was ineffective for failing to object to certain testimony, sufficiently cross-examine a witness, object to the admission of a photograph into evidence, raise a claim of self-defense or voluntary manslaughter, and object to statements made by the prosecutor during closing argument. Finding no error, we affirm.

## Facts

[2] The underlying facts, as described by this Court in Williams's direct appeal, are as follows:

> Williams and the victim, Kim Williams, were married in 1995 and two children were born of the marriage. T.W. was born in 1997, and R.W. was born in 2004. . . .
>
> . . . Near the end of January 2011, Williams, who was working in Hawaii, learned that Kim had filed a petition for the dissolution of their marriage.
>
> Williams told his work supervisor, Scott Greenan about his concern that the divorce would result in Williams losing some of his retirement money. The week of Kim's death, Williams had several conversations with Greenan about the financial aspects of the divorce. Greenan observed that Williams seemed bothered quite a bit and was upset about the matter. . . .
>
> Williams also discussed the topic [of] his impending dissolution with Kevin Chase, a coworker. . . . One day after work, Williams told Chase that it would "just be easier to kill the bitch." *Id.* at 560.
>
> On the evening of February 3, 2011, T.W. and Kim watched several television shows together while R.W. was already asleep

in bed. At approximately, 8:40 p.m., Williams came home and went to his office in the family's home. T.W. went to bed sometime between 9:00 p.m. and 9:30 p.m. At approximately, 12:40 a.m., T.W. awoke to hear his mother screaming and crying, in a manner which he had never before heard, and which was indicative of the fact that she was in a great deal of pain. T.W. heard Kim ask "Why are you doing this?" *Transcript* at 317. Williams responded in an angry voice, "Does that hurt?" *Id.* T.W. arose from bed to use the bathroom and then returned to his bed. A few minutes after lying back down, T.W. heard the sound of four gunshots.

T.W. got out of bed, turned on the lights, and walked to the area between the living room and the kitchen. He observed his mother's motionless body on the floor next to the fireplace and could tell that she had been shot. Williams was rolling around on the floor and it appeared to T.W. that Williams had shot himself. T.W. cursed at his father and asked him why he would do something like that. He then ran to the kitchen, and grabbed Kim's phone. On his way back to his bedroom, T.W. encountered R.W. in the hallway. R.W. asked T.W. why he was yelling. T.W. placed R.W. in his room and dialed 911.

***

[When sheriff's deputies responded and entered the home, they] observed that Williams was covered in blood and looked as if his face was coming apart. Williams assumed a shooter's stance and yelled, "Bang!" *Transcript* at 227. Williams then disappeared before reappearing and engaging in the same behavior. Williams then approached Deputy Bledsoe at a rapid pace and grabbed him. During the ensuing struggle, Deputy Bledsoe attempted to subdue Williams and prevent him from grabbing the sidearm. With Deputy Wise's help, Deputy Bledsoe was able to restrain Williams.

Deputy Bledsoe asked Williams, "Who did this?" *Transcript* at 236. Williams motioned toward the living room and responded,

"Ask her." *Id.* Deputy Bledsoe observed Kim's body for the first time when he looked in the direction indicated by Williams. Kim was bleeding from her face. Deputy Bledsoe then asked Williams where the gun was located. Williams again responded, "Ask her." *Transcript* at 237. . . .

\*\*\*

During the ensuing police investigation, Williams's Glock handgun was found in the living room and divorce papers were found in the passenger seat of Williams's car. A forensic DNA analyst from the Indiana State Police Department determined that the blood and DNA found at the scene belonged to Williams and Kim. A bullet retrieved from the ceiling rafters had Williams's DNA on it from passing through his face when he was shot. A Naval Criminal Investigative Service Special Agent, who worked as a forensic consultant on the case, concluded that Kim was lying down when she was shot.

\*\*\*

During the forensic pathologist's examination of Kim, he found that she had sustained four gunshot wounds, including two wounds to her face as well as gunshot wounds on her arm. The pathologist concluded from the location of the wounds that Kim had been shot first in the arm while she was in a defensive position, and that when the bullet exited her arm, it struck her face. That bullet then entered Kim's brain, leaving her incapacitated and unable to take any conscious action. Kim was then shot again in the face from less than a foot away. The pathologist concluded that Kim died as a result of a gunshot to her face, which caused the bullet to pass through her brain.

The State charged Williams with murder on February 22, 2011. . . . At the conclusion of the jury trial, Williams was found guilty of murder.

*Williams v. State*, No. 14A01-1205-CR-201, at \*1-\*3 (Ind. Ct. App. Mar. 19, 2013). The trial court sentenced Williams to sixty-five years imprisonment. Williams filed a direct appeal, arguing that there was an error with respect to jury instructions and that the sentence was inappropriate. This Court affirmed the conviction and sentence. *Id.* at \*7.

[3] On June 20, 2014, Williams filed a pro se petition for post-conviction relief, which was later amended by counsel. In pertinent part, Williams argued that he received the ineffective assistance of trial counsel. Following a hearing, the post-conviction court denied Williams's petition on August 1, 2017. Williams now appeals.

# Discussion and Decision

## I. Standard of Review

[4] The general rules regarding the review of a ruling on a petition for post-conviction relief are well established:

> "The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence." *Fisher v. State*, 810 N.E.2d 674, 679 (Ind. 2004). "When appealing from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id.* To prevail on appeal from the denial of post-conviction relief, a petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind. 1993). Further, the post-conviction court in this case made findings of fact and conclusions of law in accordance with Indiana Post–Conviction

> Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (quotation omitted).

*Hollowell v. State*, 19 N.E.3d 263, 268-69 (Ind. 2014).

A claim of ineffective assistance of trial counsel requires a showing that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant such that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Davidson v. State*, 763 N.E.2d 441, 444 (Ind. 2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability arises when there is a 'probability sufficient to undermine confidence in the outcome.'" *Grinstead v. State*, 845 N.E.2d 1027, 1031 (Ind. 2006) (quoting *Strickland*, 466 U.S. at 694). "Failure to satisfy either of the two prongs will cause the claim to fail." *Gulzar v. State*, 971 N.E.2d 1258, 1261 (Ind. Ct. App. 2012).

## II.  Assistance of Trial Counsel

Williams argues that his trial counsel was ineffective in the following respects: (1) failing to object to certain questions asked of T.W. on direct examination and failing to sufficiently cross-examine T.W.; (2) failing to object to the testimony of the pathologist; (3) failing to object to the introduction of a

photograph into evidence; (4) failing to raise claims of self-defense or voluntary manslaughter; and (5) failing to object to comments made by the prosecutor during closing arguments.

## A. Dealing with Witnesses

Williams first contends that trial counsel was ineffective for the way in which she handled T.W. and the pathologist as witnesses. Specifically, Williams argues that counsel should have objected to several questions asked of T.W. on direct examination because they were leading, irrelevant, or called for an opinion; that counsel should have asked more than five questions of T.W. on cross-examination; and that counsel should have objected to questions asked of the pathologist on redirect examination.

To establish ineffective assistance for failure to object, the petitioner must establish that the objection would have been sustained and that the petitioner was prejudiced by the failure to object. *Law v. State*, 797 N.E.2d 1157, 1164 (Ind. Ct. App. 2003). Additionally, "[i]t is well settled that the nature and extent of cross-examination is a matter of strategy delegated to trial counsel." *Myers v. State*, 33 N.E.3d 1077, 1101 (Ind. Ct. App. 2015).

## 1. Direct Examination of T.W.

Williams first directs our attention to the following discussion that occurred during the direct examination of T.W.:

    State: Tell the jury a little bit about your mom.

> T.W.: She was a—she loved tending to the garden, she loved cats, she loved me and [R.W.] with all her heart, she put us before anything else.
>
> State: Is there anything else she would like to do?
>
> T.W.: Uh . . .
>
> State: Sorority?
>
> T.W.: Yes, she was in a sorority. She helped out at Griffith Elementary as much as she could and at my school, Washington Junior High.

Trial Tr. Vol. II p. 307. Williams contends that his trial counsel should have objected to this line of questioning because it was irrelevant and its "obvious purpose was to bolster the image of the decedent in the eyes of a jury, thereby prejudicing" Williams. Appellant's Br. p. 12. Williams does not explain, however, how he was prejudiced by the jury learning that T.W.'s mother had common interests such as gardening, cats, and her children. *See Elliott v. State*, 630 N.E.2d 202, 204 (Ind. 1994) (holding that testimony from murder victim's mother regarding her son's background was relevant and properly admitted). We disagree that this testimony prejudiced Williams and find that counsel was not ineffective for failing to object to it.

[10]    Next, Williams points to the following discussions during direct examination:

> State: Okay, is [your father] saying that in a sad voice or in an angry voice?
>
> T.W.: In an anger rage voice.
>
> State: A rage voice?

T.W.: Yeah, he was mad.

*** 

State: Okay, and I'm sorry, so you see your mom laying here—dad, what's he doing?

T.W.: He's rolling around with his feet in like a choppy manner.

State: What does it look like to you?

T.W.: Uh, him rolling in like a worm, I would say.

State: Is he . . .

T.W.: He's gargling, you know.

State: Does it appear that he has . . .

T.W.: Yes, it appears that he has shot himself.

*** 

State: All right. [T.W.], based on what you observed and you heard . . . , I want you to look at the jury and you tell them what happened.

T.W.: My dad . . .

State: Just say it, [T.W.]

T.W.: My dad shot and killed my mom.

State: And, then, what did he do to himself?

T.W.: And, shot himself.

Trial Tr. Vol. II p. 317-18, 325. Williams argues that trial counsel should have objected to these questions because it was inadmissible lay witness testimony.

[11] Opinion testimony of a lay witness is admissible if the testimony is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Ind. Evidence Rule 701. The requirement that the opinion be rationally based on perception "'means simply that the opinion must be one that a reasonable person normally could form from the perceived facts.'" *Mariscal v. State*, 687 N.E.2d 378, 380 (Ind. Ct. App. 1997) (quoting *Kent v. State*, 675 N.E.2d 332, 338 (Ind. 1996)). Here, T.W.'s perception of what happened was one that a reasonable person could normally form from the circumstances. Based on what T.W. heard before the shooting and his observations of his parents immediately after the shooting, he was clearly in a position to offer a rational and helpful opinion on the nature of the shooting. We can only conclude that even if counsel had objected to these questions, her objections would have been overruled. Therefore, she was not ineffective for this reason.

[12] Finally, Williams points us to the following questions asked of T.W. during direct examination:

> State: So, [R.W.], did he come out of his bedroom?
>
> T.W.: Yeah, he came out of his room and stood right there.
>
> State: And, so, what did you do with him?
>
> T.W.: I hit him as hard as I could to get him in my arm and pick him up.
>
> State: Why?

T.W.: Because I wanted to get to get [sic] out of here as fast as I could.

State: Why?

T.W.: To call 911.

State: But, why? Why did you want to get out of here as fast as you could?

T.W.: I wanted to get to my room.

State: Why?

T.W.: So I could call 911.

State: Is it safe to say you didn't want [R.W.] to see your mom like that?

T.W.: Yes, exactly, yes.

Trial Tr. Vol. II p. 321. Williams argues that trial counsel should have objected to this testimony because the questions were leading, but he does not articulate why the admission of this testimony was prejudicial to him. Moreover, even if counsel had objected, and the objection had been sustained, the prosecutor would merely have rephrased the question. In other words, this evidence would have been admitted even if an objection had been made. We find no ineffective assistance on this basis.

## 2. Cross-Examination of T.W.

[13] Williams next complains that trial counsel did not conduct a sufficient cross-examination. Specifically, he argues that counsel should have questioned T.W. about certain allegedly inconsistent statements T.W. had made during his

pretrial deposition. At the post-conviction hearing, trial counsel explained that the jury appeared "incredibly sympathetic" towards T.W. and that a "hardcore" cross-examination would have alienated the jury against her and Williams. PCR Tr. p. 34. In counsel's opinion, the faster she got T.W. off the witness stand, the better. She believed that it "was better for [Williams] to come off as a caring father who didn't want to put his son through a lot than it was for me to make my objections." *Id.* at 55. Counsel's primary goal for T.W.'s testimony was to elicit the fact that he did not actually see what had occurred, and she achieved that goal. We find that this strategy was eminently reasonable and decline to second-guess it. We do not find counsel ineffective in this regard.

## 3. Pathologist

[14] Next, Williams argues that trial counsel should have objected to the following discussion that occurred during the redirect examination of the forensic pathologist:

| | |
|---|---|
| State: | Doctor, since this isn't a suicide or an accident, how did you rule it? |
| Doctor: | Well, the coroner, actually, determines the—which of the five choice [sic] of death certificate, but it would be my opinion this is a homicide. |

***

| | |
|---|---|
| State: | How did you characterize the second shot in your report? |
| Doctor: | It's a very close range, non contact gunshot wound. |

State:      But, in light of the first shot, how did you
            characterize it, what did you say it was for?

Doctor:     Well, I—given the very close range and the nature
            of one gunshot to the head, or face, had—we have
            to say the second shot is to make sure she is
            finished.

Trial Tr. Vol. II p. 377-78. Williams contends that by saying that the cause of the victim's death was "homicide," the pathologist impermissibly testified regarding Williams's guilt. He also contends that by saying the purpose of the second shot was to make sure the victim was "finished," the pathologist impermissibly testified as to Williams's intent. *See* Ind. Evidence Rule 704(B) (witnesses may not testify to opinions regarding the defendant's intent, guilt, or innocence in a criminal case).

[15]   As to the use of the term "homicide," our Supreme Court has noted that a pathologist is allowed to testify that the manner of the victim's death "was homicide, among other opinions he formed independently." *Ackerman v. State*, 51 N.E.3d 171, 189 (Ind. 2016). We agree with the State that from a lay person's point of view, the term "homicide" simply means that one person has killed another. Consequently, the pathologist's use of this term was not impermissible, nor did it prejudice Williams.

[16]   As to the pathologist's testimony regarding the purpose of the second shot, multiple panels of this Court have found that expert testimony regarding the intent of a person committing the crime at issue is admissible so long as the expert does not testify that *the defendant* is the one who committed the crime.

*See, e.g.*, *Dexter v. State*, 945 N.E.2d 220, 222 (Ind. Ct. App. 2011) (permissible for physician to testify that trauma to minor's head was "most likely an abusive head trauma" because the witness did not testify that she believed the defendant was responsible), *summarily aff'd in relevant part*, 959 N.E.2d 235 (Ind. 2012); *Julian v. State*, 811 N.E.2d 392, 400 (Ind. Ct. App. 2004) (permissible for an arson investigator to testify that the fire was set intentionally because investigator did not testify that the defendant intended to set the fire). Here, likewise, the pathologist did not testify that he believed that Williams was responsible for the victim's injuries and death. Therefore, any objection would have been overruled. We find no ineffective assistance on this basis.

## B. Photograph

[17] Williams next argues that trial counsel should have objected to the admission of a photograph of the victim, her children, and their two dogs. According to Williams, this evidence was unduly prejudicial.

[18] At the post-conviction hearing, trial counsel explained that she had challenged the admissibility of the photograph before trial, but the trial court had denied her request to have it excluded. When asked why she did not renew her objection at trial, counsel testified that she generally does not object in front of a jury when she knows that she is "going to get overruled unless I think it's going to really help to say it, and I didn't think that was going to help with that." PCR Tr. p. 43. We find that this was a reasonable strategic decision and decline to second-guess it. *See Curtis v. State*, 905 N.E.2d 410, 418 (Ind. Ct.

App. 2009) (holding that "'counsel cannot be faulted for failing to make an objection which had no hope of success and which might have the adverse effect before the jury of emphasizing the admissibility of [the evidence]'") (quoting *Garrett v. State*, 602 N.E.2d 139, 141 (Ind. 1992)).

## C. Self-Defense/Voluntary Manslaughter

[19] Next, Williams argues that trial counsel was ineffective for failing to raise a claim of self-defense or voluntary manslaughter. In fact, counsel did attempt to argue that Williams was guilty of voluntary manslaughter, but the trial court sustained the State's objection that no evidence of sudden heat had been presented. According to Williams, trial counsel should have called him as a witness, in which case such evidence would have been in the record.

[20] With respect to a claim of self-defense, the pathologist concluded that the victim was first shot in the arm, when she had been in a defensive position, and that when the bullet exited her arm, it hit her face and entered her brain, leaving her incapacitated and unable to take any conscious action. She was then shot again, in the face, from less than a foot away. This testimony, alone, made any claim of self-defense untenable, and trial counsel was not ineffective for failing to pursue this strategy.[1]

---

[1] We also note that if Williams had pursued this strategy, the State could have introduced into evidence a jail phone call in which Williams's statements regarding the incident were not consistent with any claim that he acted in self-defense.

[21]     With regard to voluntary manslaughter, Williams admitted at the post-conviction hearing that he did not want to testify that he voluntarily killed the victim while acting under sudden heat. Therefore, there is no reason to believe that calling him to testify would have supported a claim that he committed voluntary manslaughter instead of murder. And even if he had testified that he acted in sudden heat, the State could have introduced a jail phone call into evidence in which Williams described the incident in terms inconsistent with a claim of sudden heat. Finally, trial counsel testified that Williams gave her several different versions of the incident over the course of her representation of him, and she therefore had a very real concern about how his testimony would hold up under cross-examination. Under these circumstances, we do not find that counsel was ineffective for failing to pursue a claim of voluntary manslaughter.[2]

## D. Closing Arguments

[22]     Finally, Williams argues that counsel was ineffective for failing to object to the following statements made by the prosecutor during closing argument:

> He can't even hold it in even as he is being cuffed and he says, ask her, ask her, ask the bitch, right?

---

[2] Williams attempts to make a somewhat undeveloped and unclear argument that counsel's defense strategy as a whole was "inconsistent and erratic," reply br. p. 14, complaining that while counsel argued that the State had failed to prove knowledge or intent, she also acknowledged that he had shot his wife twice and then shot himself. In our view, counsel did the best she could with a client whose version of events changed several times, compelling eye witness testimony from his son and responding officers, and damning physical evidence and expert testimony. Under these circumstances, we do not find that her defense strategy as a whole was unreasonable or ineffective.

***

You know, one of [the victim's] final acts might have been to hide that gun because it landed right behind her head and he couldn't find it.

***

I don't want you to remember her like this, I want you to remember her like this, on a good day, with her boys beside her, and her dogs, on a beautiful Easter Sunday, and I want you to be able to say, I want you to think about this, when it was my turn, okay, when the responsibility was mine, and I saw the evidence, to convict a man of murder, I was strong enough and I was smart enough, and I did that very thing. Remember her like this. You can't put her back in this picture, folks, you can't do that, you can't bring her back, but you can say, not me, I did right by [the victim], a woman I never knew.

Trial Tr. Vol. III p. 707, 712. Williams argues that the first and second statements do not reflect the evidence introduced at trial and that the third statement urged the jury to convict Williams for reasons other than his guilt. To prove ineffective assistance for failure to object during closing argument, the defendant must prove that his objections would have been sustained, that the failure to object was unreasonable, and that he was prejudiced thereby. *Potter v. State*, 684 N.E.2d 1127, 1134 (Ind. 1997).

[23] With respect to the first statement made by the prosecutor, the record reflects that a deputy testified that when he asked Williams what had happened, Williams twice told the deputy to "[a]sk her." Trial Tr. Vol. II p. 236-37. Williams had also told his coworker shortly before the murder that it would

"just be easier to kill the bitch." *Id.* at 560. Therefore, while it is true that Williams did not refer to the victim as a "bitch" while being handcuffed, it is also true that he did refer to her as such shortly before killing her. While the statement by the prosecutor may have been an inartful combination of Williams's statements on two different occasions, it was, in fact, based on evidence in the record. Therefore, any objection would have been overruled.

[24] With respect to the second statement, it is true that the pathologist testified that the victim would have been incapable of any voluntary movement, such as hiding the gun, after being shot the first time. The prosecutor, however, did not claim that the victim had intentionally hidden the gun. It is reasonable to infer that the State was merely referring to the fact that it was fortuitous for the deputies that the victim's body hid the gun from Williams as the deputies entered the house. But even if the prosecutor was referring to a conscious act committed by the victim, Williams fails to show how he could have been prejudiced by a reference to what she might have done after she had already been shot twice in the face. Furthermore, the trial court instructed the jury in the final jury instructions that "[s]tatements made by the attorneys are not evidence." Direct Appeal Appellant's App. Vol. III p. 621; *see also, e.g.*, *Surber v. State*, 884 N.E.2d 856, 866 (Ind. Ct. App. 2008) (even if prosecutor's statements during closing argument amounted to misconduct, jury instruction that attorney statements are not evidence mitigated against a finding of prejudice). Under these circumstances, we find that trial counsel was not ineffective for failing to object to this statement.

[25] As for the third statement, Williams does not develop a substantial argument as to why counsel was ineffective for failing to object to it. Instead, he makes a conclusory statement that these comments "urged the jury to convict [Williams] for reasons other than his guilt." Appellant's Br. p. 16. We agree with the State that when viewed in context, this statement amounts to little more than a request that the jury convict Williams based on the evidence that he committed murder. *See Hand v. State*, 863 N.E.2d 386, 396 (Ind. Ct. App. 2007) (where prosecutor's comments indicated "that the jury should convict [the defendant] for [the victim], her family, and the community as a whole, the gravamen of those comments was that the evidence presented at trial supported the State's charges and, therefore, [the defendant] should be held accountable for his actions and convicted"). Williams has failed to show that it was unreasonable for trial counsel to refrain from objecting to this statement or that he was prejudiced thereby. In other words, we do not find trial counsel ineffective for failing to object to this statement.

[26] Finally, Williams argues that the cumulative effect of all the alleged instances of misconduct amounts to reversible error. As we have found no error on any of the grounds raised by Williams, we do not find that the cumulative effect of these instances amounts to any error, let alone reversible error.

[27] The judgment of the post-conviction court is affirmed.

Kirsch, J., and Bradford, J., concur.